In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Plaintiff,

v.

The STATE OF NEW HAMPSHIRE and The State of New Hampshire Public Utilities Commission, Defendants.

Bankruptcy No. 88–00043.
Adv. No. 89–08.

United States Bankruptcy Court,
D. New Hampshire.

Nov. 30, 1989.

855

Isaac M. Pachulski, Don Willenburg, Los Angeles, Cal., Kevin J. Burke, for Public Service Co.

Geoffrey B. Kalmus, New York City, J. Michael Deasy, for the Unsecured Creditors Committee.

Richard Tilton, for the Equity Committee.

Larry M. Smukler, Sr. Asst. Atty. Gen., Concord, N.H., Daniel J. Callaghan, Manchester, N.H., for the State of N.H.

William B. Gundling, Asst. Atty. Gen., Hartford, Conn., for the State of Conn.

Susan Keely, for the U.S. Trustee.

George J. Wade, Barbara J. Gould, New York City, and David J. Dunfey, Hampton, N.H., for Citicorp and Consolidated Utilities & Communications, Inc. (CUC).

Peter V. Doyle, West Springfield, N.H., for First Fidelity Bank and Amoskeag Bank.

Jeffrey G. Grody, Hartford, Conn., for Northeast Utilities Service Co.

Ted A. Berkowitz, New York City, for First Fidelity Bank.

Robert Drain, New York City, for Shearson, Lehman, Hutton, Inc.

Peter Nils Baylor, Boston, Mass., for Bank of New England and Maryland Nat. Bank.

David W. Marshall, for NEES.

John M. Mutkoski, Cheshire, Conn., for Small Power Producers and Alexandria Power Bio Energy.

Sallie H. Helm, Washington, D.C., for Spear, Leeds & Kellogg.

Noel E. Hanf, New Haven, Conn., for The United Illuminating Co.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This chapter 11 adversary proceeding involves a complaint filed by the plaintiff, Public Service Company of New Hampshire ("PSNH") against the defendants, State of New Hampshire, and the State of New Hampshire Public Utilities Commission. The complaint is for a declaratory judgment as to the preemptive effect of certain provisions of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as against conflicting state regulatory requirements, concerning certain of the restructuring transactions included in the debtor's pending plan of reorganization. The Court has jurisdiction pursuant to 28 U.S.C. §§ 157, 1334, 2201, and the general reference order dated February 1, 1985 by the U.S. District Court for New Hampshire.

The unique and unprecedented nature of these reorganization proceedings, involving a regulated monopoly electric utility debtor in reorganization, have been set forth in some detail in earlier opinions entered in this case which provide some insight into the peculiar problems raised in a bankruptcy court reorganization of such an entity, and the particular situation of PSNH in that regard. See, e.g., *In re PSNH*, 88 B.R. 521 (Bankr.D.N.H.1988); *In re PSNH*, 88 B.R. 546 (Bankr.D.N.H.1988); *In re PSNH*, 99 B.R. 155 (Bankr.D.N.H.1989); and *In re PSNH*, 99 B.R. 177 (Bankr.D.N.H.1989). Such insight provides important context and background for analysis and understanding of the possible preemptive intent of Congress in enacting the statutory provision in question—particularly in terms of the various legal and factual "circularity" problems presented by such a reorganization proceeding. See *In re PSNH*, 88 B.R. 521, 526–533 (Bankr.D.N.H.1988); *In re PSNH*, 88 B.R. 546, 552–557 (Bankr. D.N.H.1988).[1]

## I. PROCEDURAL CONTEXT

On January 28, 1988, the debtor filed its chapter 11 petition. On December 27, 1988, the debtor filed its plan of reorganization. That plan raised on its face an unresolved and unprecedented legal question which is the subject of this dispute. The issue was first raised by the State of New Hampshire in conjunction with a hearing held on January 6, 1989 concerning further procedures in this complex reorganization proceeding. See "Statement Regarding Procedural Hearing" filed by the State of New Hampshire, January 4, 1989 [Court Document No. 1547]. As a result of that hearing, the Court on January 20, 1989 issued its "Amended Order to Show Cause Regarding a Briefing Schedule", wherein the Court noted the preemption issue and ordered the parties to show cause on February 22, 1989 why the Court should not establish by order a briefing schedule and procedure for hearing and determining that issue in conjunction with the disclosure

---

1. It is particularly important to note the unique problem of "valuation circularity" presented by a chapter 11 reorganization of a regulated monopoly utility company. A corporate reorganization under chapter 11 of the Bankruptcy Code has as its crux the restructuring of the corporate entity and a valuation of the assets of the entity as so reorganized. The regulation of a electric utility under New Hampshire Law has the NHPUC's primary function as setting rates to be charged by the utility company. However, the value of the assets of a public utility company in large measure is determined by the rates that can be charged for the power produced by those assets; and the rates to be set by regulators for a public utility company in large measure is determined by the structure of the company and the value of its assets. It is apparent then that such circularity could easily lead to a stalemate when a public utility company comes into a bankruptcy reorganization court unless an appropriate resolution can be accomplished in the chapter 11 proceedings.

statement hearings to be scheduled concerning the debtor's plan.

The Court in its January 20, 1989 Order summarized the nature of the question involved with regard to the filed plan and further plan negotiations as follows:

The comments of the parties present at the January 6, 1989 hearing, and the court's own review of the plan of reorganization and related pleadings, indicate that a discrete question of law is presented by the plan in its present form i.e., is the plan on its face confirmable or non-confirmable as a matter of law in terms of the proposed use of § 1123(a)(5) of the Code to authorize transfer of assets and restructuring of entities in such fashion as would result in transfer of regulatory jurisdiction over the debtor and its rates from the New Hampshire Public Utilities Commission to the Federal Energy Regulatory Commission? See also *Bankruptcy Code* §§ 1129(a)(3) and 1129(a)(6).

The proposed use of § 1123(a)(5) by this debtor is unprecedented, with regard to a regulated utility debtor in a chapter 11 proceeding, and accordingly no party has the benefit of any prior judicial rulings to guide their further negotiations with regard to the present plan of reorganization.

On February 1, 1989, the debtor filed a Motion for Summary Adjudication of the preemption question. On February 3, 1989, the State of New Hampshire filed a written response agreeing that the issue needed to be decided. Later on February 3, 1989, after an extended oral argument on appropriate procedures for hearing the matter, the Court denied the debtor's motion, without prejudice, but allowed the debtor to file a declaratory judgment action as the more appropriate procedural mechanism to resolve the issue.

On February 7, 1989, the debtor filed a complaint for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. The complaint alleges, *inter alia,* the following as the basis and the justification for its requested relief:

7. As a public utility within the State of New Hampshire, Public Service and its activities and transaction are regulated by statutes of the Defendant State of New Hampshire (the "State") that are applied and enforced by and through an agency of the State, Defendant New Hampshire Public Utility Commission ("NHPUC").

8. Among the statutes of the State of New Hampshire that regulate Public Service and its activities and transactions are statutes that require NHPUC approval of the transfer of franchise, works, or system (RSA 374:30, 374:31), the mortgage of property (RSA 369:2), the issuance of stock, bonds, notes, and other evidences of indebtedness (RSA 369:1, 369:7), and contracts with affiliates (RSA 366:5).

\* \* \* \* \* \*

10. Public Service intends to seek confirmation and implementation of the Plan or of an amended chapter 11 plan that Public Service will file during the course of this chapter 11 case.

11. The Plan provides, and any other plan filed in this chapter 11 case will necessarily provide, for the transfer of property, including franchise, works, and system, from this chapter 11 estate to Public Service (as a reorganized debtor) or to one or more other entities.

12. The Plan provides for the mortgage of property that is currently property of the estate. Any other plan to be filed in this chapter 11 case will also so provide, unless the other plan merely were to provide for the transfer of franchise, works, or system of the estate solely to entities other than Public Service (as a reorganized debtor).

13. The Plan provides for the issuance of one or more issues of stocks, bonds, notes, or other evidences of indebtedness, either directly to existing creditors and equity security holders of Public Service or to others in exchange for consideration to be distributed to or for the benefit of existing creditors and equity security holders of Public Service. Any other plan to be filed in this chapter 11 case will also so provide, unless the other plan merely were to provide for the

transfer of franchise, works, or system of the estate solely to entities other than Public Service (as a reorganized debtor).

14. The Plan provides for contracts among affiliates that are successors to the debtor. Any other plan to be filed that provides for the creation of separate subsidiaries in a manner similar to the Plan will also so provide for contracts among affiliates.

\* \* \* \* \* \*

17. The Plan states, in substance, that Public Service need not seek, and that Public Service does not intend to seek, approval from the NHPUC of the transfer of franchise, works, or system, the mortgage of property, the issuance of securities, the contracts among affiliates, or any other transactions provided by the Plan, other than the rates proposed to be charged under the Plan, to the extent required by section 1129(a)(6) of the Bankruptcy Code.

18. Public Service does not intend to seek NHPUC approval of any transactions provided by any other plan filed in this chapter 11 case that would require NHPUC approval under applicable non-bankruptcy law, other than the rates proposed to be charged under any such other plan, to the extent required by section 1129(a)(6) of the Bankruptcy Code.

The debtor's complaint concludes by requesting the following specific declaratory relief:

Declaring the rights and obligations of Public Service and the Defendants regarding the regulatory approvals of the NHPUC, if any, required for confirmation under Section 1129 of the Bankruptcy Code and implementation of the plan or of any other plan to be filed in this chapter 11 case.

The State of New Hampshire and the New Hampshire Public Utilities Commission filed an answer to the debtor's complaint admitting, *inter alia*, the allegations in paragraphs 7 and 8, and paragraphs 11, 12 (first sentence), 13 (first sentence), and 14 (first sentence) of the complaint. The defendants made qualified responses to paragraphs 17 and 18 of the complaint.

The answer concludes by requesting the court issue judgment:

Declaring that § 1123 of the Bankruptcy Code 11 U.S.C. § 1123 does not permit a regulated electric utility debtor to disregard State and Federal regulatory law in the formation and implementation of its plan of reorganization.

The Equity Committee and Unsecured Creditors Committee were allowed to intervene and file briefs in the proceeding. Amicus curiae briefs were authorized from the office of the Consumer Advocate of the State of New Hampshire, and the State of Connecticut and its Department of Public Utility control. The Court denied intervention to the Third Mortgage Bondholders and Northeast Utilities and denied United Illuminating's motion to file an amicus curiae brief. The Court also denied the State of New Hampshire's motion to add as additional defendants the Federal Energy Regulatory Commission, the Nuclear Regulatory Commission, the Securities and Exchange Commission, the Vermont Public Service Board, the Connecticut Department of Public Utility Control, and the Maine Public Utility Commission.

The Court held a series of pre-trial conferences on the complaint for declaratory relief and itself raised a question as to the existence of an "actual controversy" under the Declaratory Judgment Act, 28 U.S.C. § 2201, which would justify declaratory relief in the circumstances. The Court directed briefing of that question by the plaintiff and defendants to be heard at further hearings on February 22 and 28, 1989, and invited briefing by other interested entities concerned with these reorganization proceedings.

The "ripeness" issue was briefed, and oral arguments were heard on March 31, 1989. On April 5, 1989, the Court entered a pretrial order which included a determination that the issue was ripe for adjudication, see *In re PSNH*, 99 B.R. 506 (Bankr. D.N.H.1989); that the debtor's February 1st motion was to be deemed a motion for summary judgment in the current proceeding; that the parties were to brief the preemption issue on a certain schedule;

and that oral argument would be heard on June 30, 1989. A motion requesting an interlocutory appeal of the ruling on the ripeness issue was filed, and the District Judge denied the motion. See *In re PSNH*, 110 B.R. 100 (D.N.H. 1989).

Oral arguments were heard on the preemption issue on June 30th, and the matter was taken under submission. The parties filed letter memorandums with the Court regarding certain additional legal issues raised in the hearing. Subsequently, the parties requested that the Court withhold ruling pending further plan negotiations. At an August 11, 1989 hearing on the status of plan negotiations, the Court at the request of the parties withheld release of this decision, inasmuch as a consensual plan not raising the preemption issue appeared possible, and included the following ruling in its "Order Regarding Examiner's Second Report and Plan Procedures" entered on August 18, 1989:

> The ruling of the court on the pending summary judgment motion in Adversary Proceeding No. 89–008 will be held in abeyance pending the filing of any plan(s) and disclosure statement(s) by the September 15th deadline set forth above. If a plan and disclosure statement mutually agreeable to the State of New Hampshire and the Debtor are filed on or before September 15, 1989, the Court's ruling on the summary judgment motion will continue to be held in abeyance, subject to the right of any committee which has intervened in Adversary Proceeding

No. 89–008 and which does not join in such plan to request that the ruling no longer be held in abeyance. Otherwise, such ruling may be issued.

A consensual plan was not agreed upon by September 15, 1989, and the Equity Committee requested a ruling on the preemption issue on September 21, 1989. [Court Document No. 2498] On September 22, 1989, I orally announced my decision and major decision points on the issue from the bench, at a hearing dealing with the timetable for acting upon four competing plans of reorganization, so that all negotiating parties would have the view of this Court on the preemption question during those negotiations. I indicated then that I would enter a full opinion and judgment in due course after other pressing hearings in this matter and other cases were completed.[2]

 Subsequent to the filing of the debtor's December 1988 plan, several competing plans of reorganization have been filed in this case as a result of this Court's Order entered on March 22, 1989 terminating the debtor's "exclusivity" period for plan formulation. See *In re PSNH*, 99 B.R. 155 (Bankr.D.N.H.1989). In addition to an amended plan filed by the debtor, three other plans were filed by creditors under which PSNH would be acquired or merged into or by three New England utility companies, i.e., Northeast Utilities of Connecticut, New England Electric System of Massachusetts and United Illuminating Company of Connecticut.[3]

---

2. This opinion has been prepared with consideration of only those pertinent case decisions (and the status of the present case) existing as of the bench ruling announced September 22, 1989.

3. As indicated, the debtor filed an amended plan on September 15, 1989. In the amended plan, the debtor does not assert that it will avoid NHPUC approvals, based on its reasonable belief that its revised plan embodied a rate plan which would be agreeable to the State of New Hampshire, since the State had earlier expressed its approval of a similar rate plan included in the Northeast Utilities Plan. However, it became apparent at the hearing on plan procedures on September 22, 1989 that the debtor did *not* have the State's agreement to its rate plan and the debtor indicated that unless it

could reach a consensual agreement with the State as to increased rates it would revert to its original plan posture. All pending plans are in flux and undoubtedly will be amended a number of times before the final confirmation hearing. Negotiations are ongoing and essentially have the situation in the same posture for the "ripeness" factor as was true at the time I heard the parties on the declaratory judgment matter in June of 1989, i.e., it is possible that the parties may settle their dispute but there still is an actual controversy between the parties justifying declaratory relief. See *In re PSNH*, 99 B.R. at 506, 508 (Bankr.D.N.H.1989).

Moreover, as indicated in Section III of this opinion, the preemption question is raised not only by those provisions of the debtor's original plan which would have resulted in federal regu-

## II. THE DEBTOR'S PLAN

Under the debtor's December 1988 plan, a holding company is created along with three wholly-owned subsidiaries. A reorganized PSNH will generate and transmit electricity, and will own the assets needed to perform these tasks. A second company, "DISCO", will be the retail distributor of electricity, and will own the assets needed to perform that task. A third company, "SERVCO", will do the planning, engineering, accounting, and financial support services, and will own the assets necessary to perform those tasks.

The Holding Company will be publicly owned and will issue shares of common stock and warrants to equity holders and creditors of PSNH. All of the common stock of reorganized PSNH, DISCO, and SERVCO, will be issued to Holding Company. Reorganized PSNH will issue new mortgage bonds, new unsecured debentures, and new preferred stock to the creditors of PSNH. These mortgage bonds will be secured by a mortgage on substantially all real and tangible personal property of reorganized PSNH. The security for the mortgage bonds will also include mortgage bonds issued by DISCO, which will be secured by substantially all of DISCO's real and tangible personal property.

Reorganized PSNH will enter into a power supply contract and a transmission contract with DISCO in which reorganized PSNH will supply and transmit power at rates provided for in those contracts. Reorganized PSNH and DISCO will enter into contracts with SERVCO to obtain support services.

This restructuring would make the wholesale rates charged by reorganized PSNH to DISCO regulated by the Federal Energy Regulatory Commission ("FERC") instead of the New Hampshire Public Utilities Commission. This would enable PSNH to recover much of its investment in the Seabrook nuclear power plant even before Seabrook operates[4] in contrast to what state law would allow before operation under the "Anti–CWIP" law in New Hampshire.[5]

The New Hampshire Public Utilities Commission would normally have to approve such a corporate restructuring pursuant to state statutes. The statutes provide for review of contracts with affiliates, see N.H.Rev.Stat.Ann. § 366:5 (1984), the issuance of securities, see N.H.Rev.Stat. Ann. § 369:1 (1984), the mortgaging of property, see N.H.Rev.Stat.Ann. § 369:2 (1984), the issuance of bonds, see N.H.Rev. Stat.Ann. § 369:7 (1984), and the leasing of property, see N.H.Rev.Stat.Ann. § 374:30 (1984). These statutes, and the debtor's plan, present the conflict as to whether the Bankruptcy Code preempts state review.

## III. PRECISE ISSUE TO BE DECIDED

The precise question presented—at least in the narrowest formulation appropriate in

---

lation of some aspects of the reorganized debtor's rates, but also by the more mundane features regarding a myriad of provisions for transfer of properties, issuance of securities or other transactions that "will inevitably be at least a part of a reorganization of a complex entity such as the present debtor.... [and] in effect inherent in the consideration of any plan regarding a regulated monopoly utility company ..." *Id.* at 509. The three other plan proponents indicate that they intend to seek NHPUC approval of the restructuring transactions involved in their plans but also reserve their rights to assert preemption under the Bankruptcy Code in the event that a satisfactory final agreement on rate increases and preference for their particular plan of reorganization is not obtained—as well as other contingencies relating to the implementation of their plan of reorganization. For all of these reasons, while I have reconsidered the "ripeness" question

presented in this matter, in view of developments since the June hearing, I have concluded that the legal question presented is still ripe for decision and that the releasing of that decision is appropriate and fair in all the circumstances of this complex case.

4. FERC permits up to 50 percent of the investment in plant under construction to be included in rate base. In the event of abandonment, FERC allows recovery in rates of up to one-half of the investment in the abandoned plant over its estimated life, with return on the unamortized portion. See *Debtor's Memorandum,* Court Doc. No. 1636, pp. 8–9.

5. Rev.Stat.Ann. § 378:30–a (1984) provides that investment in a nuclear power plant cannot be recovered in rates until the plant is actually providing electricity.

my judgment for declaratory ruling—is whether the restructuring transactions included in the debtor's plan filed on December 27, 1988 requires the New Hampshire Public Utilities Commission's approval under various state statutes or whether those laws are preempted by the Bankruptcy Code. The fact that certain of those restructuring transactions would have the effect of allowing one aspect of the reorganized entities' operations, *i.e.*, the wholesale generation of power, to come under the regulatory authority of the Federal Energy Regulatory Commission, is *not* the strict *legal* question presented for analysis in the first instance. Section 1123(a)(5) of the Bankruptcy Code says nothing explicitly about transfer of regulatory jurisdiction to the FERC federal agency.

Any reorganization plan providing for transfer of assets, mortgaging of properties, and issuance of securities (all common in any complex reorganization) would present the same preemption legal question even though the plan involved had *no* provisions that would bring FERC regulation into the affairs of the reorganized company.[6] The debtor notes accurately in its memorandum on the question presented to this court for decision:

> The State's position has ramifications which go far beyond the instant Plan, or any similar plan, because the inescapable result of the State's position is that *no* plan can be confirmed in this case unless it is approved by the PUC. PSNH's indebtedness is in excess of $1.5 billion. It is inconceivable that a plan would provide for the payment of that indebtedness entirely in cash (rather than in the form of new debt and equity securities) unless there were either a sale of assets or the issuance of new securities to the public to refinance the existing debt—either of which, the State contends, requires PUC approval. Thus, *any* plan in

this case will have to provide for the issuance of debt and equity securities, the transfer of assets, or both. Under the State's view, such securities issuance or asset transfer would be subject to PUC approval, regardless of this Court's ruling on a plan.... Additionally, PSNH's debt includes over $800 million of secured indebtedness. To the extent that new indebtedness with different terms is issued under a plan to replace that existing indebtedness, such new indebtedness will almost certainly have to be secured. Under the State's view, any such collateralization will be subject to PUC approval; and if the PUC were not to approve such collateralization, the plan could not be implemented.

*Debtor's Memorandum,* Court Doc. 1636, Adv. No. 89–08, p. 2–3.

It is true of course that the result of the debtor's particular plan causing FERC regulatory activity to control some aspects of the reorganized business is a factual result that will bear upon the interpretation of the intent of Congress in the enactment of § 1123(a)(5) to a certain extent. However, it needs to be emphasized that the question presented to this court for declaratory ruling is not whether plans of reorganization filed under the Bankruptcy Code will preempt regulatory jurisdiction generally. Thus, the issue is a narrower one than may first appear.

## IV. KEY STATUTORY PROVISIONS

In order to determine whether chapter 11 of the Bankruptcy Code preempts the state utility laws in question we must first examine the language of the most pertinent provisions of that chapter of the Code.[7]

Section 1123(a)(5) of the Bankruptcy Code reads:

---

**6.** It is noted that the State of New Hampshire in the present case has admitted the allegation in paragraph 11 of the declaratory judgment complaint to the effect that any plan filed in this chapter 11 case will necessarily provide for a transfer of property, including franchise, works and the system to the reorganized debtor or to one or more other entities.

**7.** The Bankruptcy Code of course has been enacted pursuant to the express legislative power of Congress to "establish uniform laws on the subject of Bankruptcies throughout the United States." *Constitution,* Art. I, Sec. 8, cl. 4.

*§ 1123. Contents of plan.*

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

\* \* \* \* \* \*

(5) provide adequate means for the plan's implementation such as—

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other terms of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

Section 1129 of the Bankruptcy Code, in its most pertinent portions provides:

*§ 1129. Confirmation of Plan.*

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

\* \* \* \* \* \*

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—(A) each holder of a claim or interest of such class—(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

\* \* \* \* \* \*

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The debtor argues that §§ 1123 and 1129 are the primary and determinative statutory provisions. The defendants argue however that §§ 1141 and 1142 are equally important and decisive. Those sections provide as follows:

*§ 1141. Effect of Confirmation.*

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

§ 1142. *Implementation of plan.*

(a) Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

(b) The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

## V. STATUTORY HISTORY

The history of bankruptcy legislation indicates that prior to 1978 public utilities had to have public utility commission approval for plans of reorganization. Then, with the adoption of the Bankruptcy Reform Act of 1978 (cited in this opinion as Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*), the specific statutory requirements for regulatory approval were deleted.

Our inquiry starts with Section 77B, dealing with corporate reorganization which was added to the Bankruptcy Act of 1898 by amendment in 1934. Previously such reorganizations were not covered by the Bankruptcy Act but were handled as equity receiverships in the federal courts. 6 *Collier on Bankruptcy*, 14th Ed., paragraph 0.04 (1978). Section 77B(e)(2) provided for public utility commission comments on a

public utility reorganization plan as follows:

(2) In case the debtor is a utility subject to the jurisdiction of a regulatory commission or commissions or other regulatory authority or authorities, created by the laws of the State or States in which the properties of the debtor are operated, a plan of reorganization shall not be confirmed until (a) it shall be submitted to each such commission or authority having regulatory jurisdiction over the debtor, (b) an opportunity shall be afforded each such commission or authority to suggest amendments or objections to the plan, and (c) the judge shall consider such amendments or objections at a hearing at which each such commission or authority may be heard.

In addition, intrastate public utility plans had to have state approval. Section 77B(e)(2) continues as follows:

In case the debtor is a public utility corporation wholly intrastate in character no court shall approve any plan of reorganization if the regulatory commission of such State having jurisdiction over such public utility certifies that the public interest is affected by said plan, unless said regulatory commission shall first approve of said plan as to the public interest therein and the fairness thereof. If such regulatory commission shall not within thirty days or such additional period as the court may prescribe after the submission of a plan to it file said certificate it shall be deemed that the public interest is not affected by said plan.

Moreover, Section 77B(f) provided for state approvals at the time of confirming the plan as follows:

(f) After hearing such objections as may be made to the plan, the judge shall confirm the plan if satisfied that ... in case the debtor is a utility corporation subject to the jurisdiction of a regulatory commission or commissions or other regulatory authority or authorities, created by the laws of the State or States in which the properties of the debtor are operated, all authorizations, approvals, or consents of each such commission or au-

thority required by the laws of such State or States have been obtained.

The Bankruptcy Act was extensively amended by the Chandler Act of 1938. But state approval for public utility plans of reorganization was still required. Sections 177 and 178 in Chapter X of the amended Act provided for pre-confirmation approval as follows:

> Sec. 177. In case a debtor is a public-utility corporation, subject to the jurisdiction of a commission having regulatory jurisdiction over the debtor, a plan shall not be approved, as provided in section 174 of this Act, until—
>
> (1) it shall have been submitted to each such commission;
>
> (2) an opportunity shall have been afforded each such commission to suggest amendments or offer objections to the plan; and
>
> (3) the judge shall have considered such amendments or objections at a hearing at which such commission may be heard.
>
> Sec. 178. In case a debtor is a public utility corporation, wholly intrastate, subject to the jurisdiction of a State commission having regulatory jurisdiction over such debtor, a plan shall not be approved, as provided in section 174 of this Act, unless such State commission shall have first certified its approval of such plan as to the public interest therein and the fairness thereof. Upon its failure to certify its approval or disapproval within thirty days, or such further time as the court may prescribe, after the

submission of the plan to it, as provided in section 177 of this Act, the public interest shall, for the purposes of such approval and of the confirmation of the plan, not be deemed to be affected by the plan.

In addition, Section 224 provided for approval upon confirmation of a plan as follows:

> Sec. 224. Upon confirmation of a plan
> . . .
>
> (2) the debtor . . . shall take all action necessary to carry out the plan, including, in the case of a public-utility corporation, the procuring of authorization, approval, or consent of each commission having regulatory jurisdiction over the debtor or such other corporation; . . .

After 44 years of requiring state approval for public utility reorganizations, the statutory law substantially changed with the adoption of the 1978 Code as indicated above.[8] There is only one reference in chapter 11 of the Bankruptcy Code to any utility regulatory agency approvals and that is for rates. This reference is contained in the § 1129(a)(6) provision quoted above concerning confirmation of a plan.

There are other provisions in chapter 11 requiring approval of regulatory agencies in the case of railroad reorganizations, carried over from the prior provisions under § 77 of the Bankruptcy Act. See Bankruptcy Code § 1172(b), requiring certain approvals by Interstate Commerce Commission.[9]

The legislative history of the 1978 Code reveals no explicit discussion of public utili-

---

**8.** The State of New Hampshire argues that former Chapter XI under the prior Act had no specific reference to regulatory approvals and deems this significant in the consideration of legislative history. See Brief of State of New Hampshire filed May 30, 1989, pp. 48–53. [Court Document No. 87] This argument I believe has no weight in this context since under the prior Act no one would have seriously considered Chapter XI dealing with "Arrangements" under that Act relevant to public utility reorganizations. Chapter XI dealt with relatively simple compositions—and normally of the smaller nonpublic companies. See *S.E.C. v. U.S. Realty Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940). Chapter X of the prior Act dealt with "Corporate Reorganizations" of major compa-

nies and clearly was the vehicle for bankruptcy reorganization proceedings dealing with utility corporations. See, e.g., *In re North Am. Light & Power Co.*, 101 F.Supp. 931 (D.Del.1951), aff'd 202 F.2d 638 (3d Cir.1953); *Petition of Portland Elec. Power Co.*, 97 F.Supp. 875 (D.Or.1943); *In re Midland United Co.*, 64 F.Supp. 399 (D.Del. 1946); *Matter of United Tel. & Elec. Co.*, 36 F.Supp. 136 (D.Del.1940).

**9.** Outside of chapter 11, the provisions with regard to adjustment of debts of a municipality, in chapter 9 of the Code, also explicitly provide for certain required approvals by both federal and state regulatory agencies. Bankruptcy Code § 943(b)(6).

ty reorganizations or the obvious change being made in the statutory provisions regarding such reorganizations—as opposed to the carryover of the regulatory approval requirements in railroad reorganizations. The *only* discussion in the committee reports, regarding the provisions of Section 1123(a)(5), is the following which appeared in both the House and Senate reports:

Paragraph (4) [later to become (5)] of subsection (a) is derived from section 216 of chapter X with some modifications. It requires the plan to provide adequate means for the plans execution. These means may include retention by the debtor of all or any part of the property of the estate, transfer of all or any part of the property of the estate to one or more entities, whether organized pre- or post-confirmation, merger or consolidation of the debtor with one or more persons, sale and distribution of all or any part of the property of the estate, satisfaction or modification of any lien, cancellation or modification of any indenture or similar instrument, curing or waiving of any default, extension of maturity dates or change in interest rates of securities, amendment of the debtor's charter, and issuance of securities.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 407, (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 119 (1977) U.S.Code Cong. & Admin. News 1978, pp. 5787, 5905, 5963, 6363.

In addition, there was one statement on the floor concerning section 1123, by Senator DeConcini as follows:

Section 1123 of the House amendment represents a compromise between similar provisions of the House bill and Senate amendment. The section has been clarified to clearly indicate that both secured and unsecured claims, or either of them, may be impaired in a case under title 11. In addition assumption or rejection of an executory contract under a plan must comply with section 365 of title 11. Moreover, section 1123(a)(1) has been substantively modified to permit classification of certain kinds of priority claims. This is important for purposes of confirmation under section 1129(a)(9).

Section 1123(a)(5) of the House amendments is derived from a similar provision in the House bill and Senate amendment but deletes the language pertaining to "fair upset price" as an unnecessary restriction. Section 1123 is also intended to indicate that a plan may provide for any action specified in section 1123 in the case of a corporation without a resolution of the board of directors. If the plan is confirmed, then any action proposed in the plan may be taken notwithstanding any otherwise applicable non-bankruptcy law in accordance with section 1142(a) of title 11.

124 Cong.Rec. H11103 (Sept. 28, 1978); S17419 (Oct. 6, 1978).

The 1984 Amendments to the Code had one noteworthy change. Section 1123 was amended to begin with *"Notwithstanding any otherwise applicable nonbankruptcy law,* a plan shall—" (emphasis added). This was, indicated to be a technical amendment. The first bill introduced making this change was entitled "An Act to Correct technical errors, clarify and make minor substantive changes to Public Law 95–598." H.R.Rep. No. 1195, 96th Cong., 2d Sess. 22 (1980). Although this bill did not become law, a subsequent bill incorporated the "technical stylistic change[ ]", S.Rep. No. 150, 97th Cong., 1st Sess. 15 (1981), that also failed. The bill that finally became law arose from a Senate bill that referred to this change as a "technical stylistic change[ ]". S.Rep. No. 65, 98th Cong., 1st Sess. 84 (1983). There are no committee reports with regard to the 1984 amendments, but the change to § 1123(a)(5) was included verbatim from the prior bills under a subtitle captioned "Miscellaneous Amendments". The 1984 Amendments came out of a conference committee with no report other than the agreed-upon bill itself. On the floor the changes including the change to § 1123(a)(5) were referred to as the "technical amendments" subtitle. 130 Cong.Rec. S8887, S8888 (June 29, 1984).

The only relevant subsequent change to the Code, in the 1988 amendments to chapter 9 dealing with municipal reorganizations, is an instance in which Congress acted *explicitly* to *include* regulatory

agencies in the process of approval of restructuring plans of reorganization. The change was to 11 U.S.C. § 943(b)(6). It was amended to require as a condition to plan confirmation that:

> Any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan, has been obtained, or such provision is expressly conditioned on such approval.

The scope of this regulatory approval is far broader than in the non-municipal chapter 11 reorganization, which only requires rate approval under section 1129(a)(6). The legislative history for 943(b)(6) made this clear:

> These regulatory approvals are not limited to rates, but extend often to such other matters as the acquisition or disposition of property or the incurring of indebtedness.

H.R.Rep. No. 1011, 100th Cong., 2d Sess. 9 (1988), U.S.Code Cong. & Admin.News 1988 pp. 4115, 4123. Since § 1123(a)(5) specifically applies in chapter 9 proceedings, pursuant to § 901 of the Code, the "notwithstanding any otherwise applicable nonbankruptcy law" provision in § 1123(a)(5) would have been applicable to chapter 9 proceedings *but for* the change made to § 943(b)(6).

Finally, it should be noted that the contraction of the involvement and approval authority of regulatory agencies which occurred in the enactment of the 1978 Bankruptcy Reform Act was not limited to state public utility commissions but involved regulatory agencies generally. The debtor has documented in some detail the legislative history with regard to the reduction of the role of the Securities and Exchange Commission and the Interstate Commerce Commission with regard to corporate reorganizations under chapter 11 of the new Code. [Debtor Reply Memorandum, Court Doc. No. 94, Adv. No. 89–08, pp. 28–38].

## VI. THE "TRADITIONAL POWER" FACTOR

■ One general assertion by the State of New Hampshire as to preemption should be put in perspective at this point before a detailed examination of preemption principles and decisions. To avoid the obvious implication that Congress *intended* to do what it did (by deleting the prior statutory references to regulatory agency approval for public utility reorganizations in enacting the 1978 Code) the State argues that if Congress had intended preemptive effect by the 1978 Bankruptcy Code it would have expressed that intent more explicitly in view of long-established deference to "traditional state powers" dealing with local regulatory activity.

The State points by analogy to the provisions of 28 U.S.C. § 959(b), which provide that a debtor in reorganization is required to "manage and operate the property in [its] possession ... according to the requirements of valid laws of the State in which such property is situated...." The State then argues:

> Although 28 U.S.C. § 959(b) does not directly pertain to the implementation of plans of reorganization, it reinforces the conclusion that the general policy of Congress is not to permit reorganizing debtors to transgress state police power laws, and expressions of contrary congressional intent must necessarily be more explicit than any of those articulated by PSNH and the Committees.[10]

While 28 U.S.C. § 959 does provide that the trustee or debtor-in-possession must comply with all valid state laws, numerous decisions have held that an exception exists under section 105 and chapter 11 of the Bankruptcy Code. Under this exception, a court may restrain regulatory action that would threaten the estate in reorganization.

The leading case for this proposition is *N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d 695 (8th Cir.1985). In this case, the reorganization court had preliminarily enjoined the N.L.R.B. from proceeding with hearings on unfair labor practice charges. The Court of Appeals held that the reorga-

---

**10.** Memorandum of State of New Hampshire, Court Doc. No. 87, Adv. No. 89–08, p. 47.

nization court could "enjoin federal regulatory proceedings under § 105 when those proceedings would threaten the debtor's estate." *Id.* at 698. (In this instance, the litigation expense, and the time and effort of management used to defend the litigation, would threaten the estate.)

In making the decision in *Superior Forwarding,* the Eighth Circuit relied in part on the Ninth Circuit Court of Appeals who had previously established this same principle. In *Bel Air Chateau Hosp.,* 611 F.2d 1248, 1251 (9th Cir.1979) (dictum), the Court stated "[i]f regulatory proceedings threaten the assets of the estate, the decision to issue a stay can then be made on a discretionary basis." The Seventh Circuit agreed with the *Bel Air* Court's statement in *Matter of Shippers Interstate Serv., Inc.,* 618 F.2d 9, 13 (7th Cir.1980) (dictum). The Fifth Circuit made a similar statement in *Securities and Exchange Comm'n v. First Fin. Group,* 645 F.2d 429, 440 (5th Cir.1981) (dictum), when it said: "to the extent that the exercise of this [regulatory] jurisdiction threatens the assets of the debtor's estate, the bankruptcy court may issue a stay of those proceedings. 11 U.S.C. § 105(a)."

As one court has stated: "[T]he Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Chateaugay Corp.,* 93 B.R. 26, 29 (S.D.N.Y.1988) (quoting *In re Baldwin–United Corp. Litig.,* 765 F.2d 343, 348 (2d Cir.1985)). See also *In re Chanticleer Assoc., Ltd.,* 592 F.2d 70, 74 (2d Cir.1979); *In re Johns–Manville Corp.,* 91 B.R. 225, 227 (Bankr.S.D.N.Y.1988).

Several bankruptcy court decisions have involved cases where the court enjoined regulatory activity due to the adverse effects on the operations of the debtor while attempting to reorganize in bankruptcy. The most extreme case occurred in *In re Metro Transp. Co.,* 64 B.R. 968 (Bankr.E.D.Pa.1986). In this case, the Court enjoined enforcement of a Pennsylvania Public Utility Commission order denying the chapter 11 debtor's application for self-insurance of taxicabs. The relief was granted principally because otherwise the debtor would have gone out of business. Two other cases include: *In re MCorp,* 101 B.R. 483 (S.D.Tex.1989) (enjoining Federal Reserve System from prosecuting administrative action against debtor—a nonbank corporation holding company); *In re Richmond Paramedical Serv., Inc.,* 94 B.R. 881 (Bankr.E.D.Va.1988) (enjoining Department of Health and Human Services from excluding provider that was chapter 11 debtor from Medicare and Medicaid programs for 60 days). See also *In re Kaiser Steel Corp.,* 87 B.R. 662, 665–66 (Bankr.D. Colo.1988) (dictum).

One of these cases, *In re MCorp, supra,* involved a problem somewhat analogous to the question in the present case. The debtor in that chapter 11 proceeding was a bank holding company and two of its nonbank subsidiaries. The debtor applied in the District Court for a preliminary injunction against the Board Of Governors of the Federal Reserve System seeking to enjoin the board from certain administrative proceedings against the holding company and the nonbank subsidiaries "as part of the board's regulation of the safety and integrity of the bank subsidiaries." *Id.* at 484. The District Court noted: "The issue is whether a nonbank corporation that owns banks and nonbanks as subsidiaries is entitled to have its bankruptcy case principally directed by the banking agencies or by the bankruptcy process." *Id.* The court noted that the proceeding before it was "in the nature of a preliminary declaratory judgment rather than a normal preliminary injunction" in that the injunction requested "will prospectively assign one authority or another to supervise a restructuring." *Id.* at 485.

The Court in *MCorp* ruled the federal banking regulatory agencies could not interfere with the restructuring of the debtor, by conducting the administrative proceedings in question. In finding injunctive relief appropriate, the Court stated:

A. MCorp is likely to prevail on the merits of its legal priority claim.

The automatic stay is applied rigorously, and only in exceptional cases is there a departure from protecting the debtor. Where the regulation is inextricably mixed with the restructuring process rather than some ancillary public health or safety question, MCorp ought to succeed with its claim of insulation from the Board by the automatic stay. Even if the regulatory exemption applies, the highly probable result is MCorp's success because of the availability of the anti-interference protection.

B. Enjoining the Board is necessary to prevent imminent and irreparable harm to the Debtor; responding to the Board's proceedings deprives MCorp of resources desperately needed to prepare for its reorganization. If MCorp is to survive, to the benefit of the creditors and the government, it must act quickly, for a lingering Chapter 11 case inevitably becomes a liquidation. Obliging MCorp to respond in multiple forums to multiple agencies, each with its own internal and external priorities, would dissolve the focus MCorp needs to see the route to survival.

C. The risk to MCorp in both probability and magnitude exceeds the possible danger to the Board's interests. The safeguards of the bankruptcy code ensure the protection of the generalized interest of the Board in healthy holding companies.

*Id.* at 485–86.

The Court in *MCorp* made a distinction between enjoining regulatory actions that go toward the restructuring occurring in a bankruptcy, and the regulatory actions that affect normal operations of the debtor. For example, the Court at one point stated:

When a bank holding company is a debtor in possession, the conflict between the court's restructuring of the corporation and the Board's regulating can be resolved by allowing the Board to participate in the court proceeding. Preclusion by the bankruptcy forum would not cover the Board's clearinghouse or monetary functions, but it would restrict the Board's supervision of MCorp's asset allocation, intra-group transactions, and third-party contracts. This would give the Debtor the reprieve needed to retrieve its vitality.

Allowing the Board's proceedings to continue in a separate forum poses several problems. Parallel proceedings are both confusing and inefficient. The potential for a successful reorganization would be jeopardized. The bankruptcy code is designed to be a comprehensive plan to rehabilitate the debtor to the exclusion of actions impairing reorganization.

Without minimizing the importance of the Board's administrative power over bank holding companies, the need for the court's power over the entirety of the debtor's estate takes precedence. This preemption is supported by policy and law.

*Id.* at 487.

The Court in *MCorp* also found that enjoining the regulatory agency would not harm the public because the bankruptcy judge has ample power to protect the public while ensuring that the equally important goal of reorganization proceeds forward. Thus, the Court stated:

Whatever the role of the automatic stay, the bankruptcy code authorizes an injunction against third parties from conducting otherwise fully legitimate actions when those actions would impede the viability of the debtor's reorganization. The Board claims an exemption from the anti-interference power parallel to the regulatory exemption from the automatic stay. Virtually any company is subject to a variety of regulatory agencies, and no reorganization would be possible without requiring the federal, state, and local authorities to submit their claims through the bankruptcy process. Securities issued as a consequence of a bankruptcy supervised reorganization are expressly exempt from the registration requirements of the Securities and Exchange Commission. 11 U.S.C. § 1145.

The court shares the Board's concern that the laudable but limited purposes of bankruptcy not be perverted into an escape from regulation. The bankruptcy process includes a vigilant, fully empowered judge who will prevent individual or collusive efforts to evade the Debtor's responsibilities to the public.

*Id.* at 489.

Other cases have used § 105 to enjoin regulatory agencies for other reasons. See *In re Hunt,* 93 B.R. 484 (Bankr.N.D.Tex. 1988) (enjoining Commodity Futures Trading Commission from imposing civil monetary penalties on debtors); and *In re Sam Daily Realty, Inc.,* 57 B.R. 83 (Bankr.D. Hawaii 1985) (enjoining state Department of Commerce and Consumer Affairs from enforcing money judgment for violations by debtor realty company). See also *Matter of American Central Airlines, Inc.,* 52 B.R. 567 (Bankr.N.D.Iowa 1985) (enjoining local airport scheduling committee from reallocating debtor's landing slots).[11]

As the state itself notes, 28 U.S.C. § 959 is not directly relevant to the present case, in that it deals with operational aspects of a business in reorganization, rather than with the effect of the restructuring included in a reorganization plan on the powers of regulatory agencies to otherwise approve such transactions. However, when the gloss written upon the statute by the injunctive action decisions discussed above is examined, it takes considerable force away from the State's attempt to portray "traditional" regulatory powers as some-

how sacrosanct from interference in bankruptcy reorganization proceedings.

Indeed, even in the case of the specific disruption of state regulatory power here involved, *i.e.,* the possibility of a transfer of some portion of regulatory jurisdiction to FERC by virtue of corporate restructuring in the plan, leading to a wholesale generating entity, neither Congress nor the Supreme Court have seen any apparent problem in the preemptive effect on local rates of the setting by FERC of rates for the wholesale component of purchased power. See *Mississippi Power & Light v. State of Mississippi,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988).[12]

None of the cases or the statutes discussed here are directly applicable to the present case. The analysis here has been presented only to lay aside the concept that disruption of traditional regulatory power has any *dispositive* importance in resolving the present case.

## VII. THE "PUBLIC INTEREST" FACTOR

Another assertion by the defendants that I believe needs to be put in perspective at the outset, with the result that it will be seen not to be dispositive on the question before the court, is the argument that the "public interest" factor involved in regulat-

---

**11.** Other cases have held that § 105 injunctive relief might be appropriate except for the facts of the case. See *Matter of Commonwealth Oil Ref. Co., Inc.,* 805 F.2d 1175 (5th Cir.1986), cert. denied 483 U.S. 1005 (1987) (EPA action went forward because debtor was not likely to succeed on merits); *In re Compton Corp.,* 90 B.R. 798 (N.D.Tex.1988) (Department of Energy could enforce claim for oil price overcharges due to lack of harm to estate); *In re Rabzak,* 79 B.R. 966 (Bankr.E.D.Penn.1987) (no harm to estate to justify enjoining action for violation of township rubbish ordinance); *In re Security Gas & Oil, Inc.,* 70 B.R. 786 (Bankr.N.D.Cal.1987) (state enforcement of environmental laws not enjoined because it would not interfere significantly with bankruptcy case); *In re Norwesco Dev. Corp.,* 68 B.R. 123 (Bankr.E.D.Pa.1986) (no irreparable harm to comply with state environ-

mental order); *In re Wengert Transp., Inc.,* 59 B.R. 226 (Bankr.N.D.Iowa 1986) (injunction denied against hearings by state transportation agency on certificate of public convenience and necessity); *In re Beker Indus. Corp.,* 57 B.R. 611 (Bankr.S.D.N.Y.1986) (state environmental agency hearings posed no threat to debtor); *In re Professional Sales Corp.,* 56 B.R. 753 (N.D.Ill. 1985) (refuse to enjoin EPA action due to lack of harm to estate); *In re County Fuel Co., Inc.,* 29 B.R. 534 (Bankr.D.Md.1983) (DOE action allowed because it would not interfere with bankruptcy proceeding); *In re Kawano, Inc.,* 27 B.R. 855 (Bankr.S.D.Cal.1983) (state labor agency could proceed with labor claim due to lack of irreparable injury).

**12.** See discussion, infra, at 889–890, for further detail.

ing a monopoly utility company will somehow be lost if the Bankruptcy Code provisions are determined to be preemptive of NHPUC powers regarding the restructuring necessary for a corporate reorganization.

The defendants first argue that their regulatory authority is a "police power" that deserves greater insulation from the federal bankruptcy reorganization process. It is true that police power enforcement of issues dealing with imminent threats to public *health* and *safety* are accorded overriding importance notwithstanding bankruptcy proceedings. Cf. *Midlantic National Bank v. N.J. Dept. of Environ. Protection*, 474 U.S. 494, 507, Fn. 9, 106 S.Ct. 755, 762, Fn. 9, 88 L.Ed.2d 859 (1985). See also *Saravia v. 1736 18th Street N.W.*, 844 F.2d 823, 17 BCD 841, 845 (D.C.Cir.1988). However, federal preemption is more likely when the state "police power" involved is economic regulation rather than health or safety. In the first place, it has been recognized in the analogous situation of preemption involving the Interstate Commerce Clause of the Constitution that the mere labeling of a state activity as "police power" regulation will not prevent preemption by itself. As noted by Professor Tribe in his treatise, *American Constitutional Law*, the Foundation Press, Inc., p. 437 (2nd Ed.1988):

> Although the distinction between "police regulation" and "regulation of interstate commerce" has long since been rejected as too wooden to be of much help in the actual decision of particular cases, it survives as a generally accurate retrospective determinant of the relative weights imputed by the Supreme Court to the interests asserted to justify state regulations. State regulations seemingly aimed at furthering public health or safety, or at restraining fraudulent or otherwise unfair trade practices, are less likely to be perceived as "undue burdens on interstate commerce" than are state regulations evidently seeking to maximize the profits of local businesses. Indeed, where the Supreme Court has held that the national interest in the free flow

> of commerce supersedes a state interest in public safety, it has generally seemed that the challenged statute contributed only marginally if at all to the public safety. In contrast, economically based state regulations have almost invariably been struck down. In applying this dichotomy, one would have to say that regulations seemingly focused on preserving local *employment* as such rather than on maintaining local *profits* have sometimes received treatment almost as favorable as regulations concerned with health or other non-financial aspects of well-being. (Citations and footnotes deleted).

It likewise does not help to label the state activity as a "traditional" police power of the states as indicated above. The Supreme Court has recently abandoned a short-lived attempt to draw hard and fast rules between "traditional" and "nontraditional" state powers in the preemptive context. *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). As amplified by Professor Tribe in his treatise:

> The Court [in *Garcia*] recognized that "municipal ownership and operation of a mass-transit system is a traditional governmental function," but went on to state, "[o]ur examination of this 'function' standard applied in [this] and other cases over the last eight years now persuades us that the attempt to draw the boundaries of state regulatory immunity in terms of 'traditional governmental function' is not only unworkable but is inconsistent with established principles of federalism and, indeed, with those very federalism principles on which *National League of Cities* purported to rest. That case, accordingly, is overruled." After noting that the Court "has made little headway in defining the scope" of traditional government functions, Justice Blackmun noted a "more fundamental problem[,] that neither the governmental/proprietary distinction nor any other that purports to separate out important governmental functions can be faithful to the role of federalism in a democratic society. The essence of our

federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal, no matter how unorthodox or unnecessary anyone else—including the judiciary—deems state involvement to be." The Court thus "reject[ed], as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'" (Citations and footnotes deleted)

Tribe, *supra,* p. 393.

The foregoing discussion concerning preemption analysis under Commerce Clause of the Constitution is equally applicable for present purposes since the basic approach is the same in terms of any exercise of federal plenary legislative power under the Constitution. *California Coastal Commission v. Granite Rock Co.,* 480 U.S. 572, 107 S.Ct. 1419, 1424–25, 1431–32, 94 L.Ed.2d 577 (1987) (Property Clause). As Professor Tribe notes:

> Most problems pertaining to federal preemption have arisen in close connection with the commerce clause; the relevant federal legislation was enacted pursuant to that clause, and the challenged state or local action was vulnerable to commerce clause attack as well as to preemption arguments. But the principles developed in the preceding sections are not limited to this context; essentially the same techniques are used to determine the consequences for state action of

*any* exercise of a plenary federal authority.

Tribe, *supra* p. 508.

Accordingly, such analysis would apply as well when Congress exercises its plenary legislative authority under the bankruptcy clause of the Constitution.[13]

■ The defendants argue secondly that preemption will create a void leaving the public interest otherwise safeguarded by the NHPUC unprotected. The short answer to this contention is that the public interest *will* continue to be the subject of regulatory authority with regard to the ongoing operations and rates to be charged by the reorganized debtor. While the debtor's plan, if confirmed, would result in a split in that regulatory authority between the Federal Energy Regulatory Commission, with regard to the entity generating wholesale power, and the NHPUC with regard to the retail and distribution operations, consideration in that overall regulatory process for the public interest does not just disappear because of a restructuring accomplished in a chapter 11 proceeding. Indeed, it is clear that appropriate public interest standards (including protection from "excessive impact on rate payers" in recovering costs from a cancelled nuclear plant) apply in FERC rate-setting proceedings. See *Boston Edison Company/Town of Concord, et al, v. Federal Energy Regulatory Commission,* 885 F.2d 962 (1st Cir. 1989).

Moreover, Congress has in fact deliberately legislated a "dual-regulatory system" with regard to the public utilities of this country and the Supreme Court has recognized a preemptive intent on that part of

---

**13.** It is not clear whether the defendants may be arguing for some protection for "traditional powers" in terms of the Tenth Amendment to the Constitution since they nowhere cite that Constitutional provision. However, that argument—if intended—would also not be dispositive in the present case. *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 1360–61, 99 L.Ed.2d 592 (1988) ("States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity."). As noted by the Bankruptcy Court in *Matter of Stroud Wholesale, Inc.,* 37 B.R. 735,

739 (Bankr.E.D.N.C.1984): "On several occasions when there has been a conflict between the powers of Congress to enact legislation to establish uniform laws on the subject of bankruptcies and the rights of the states under the Tenth Amendment, the Supreme Court recognized the paramount right of the United States Congress to enact uniform laws on the subject of bankruptcies. *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940); *International Shoe Co. v. Pinkus,* 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318 (1929)."

Congress in that regard.[14] Accordingly, much of the argument and heat generated in this declaratory judgment proceeding, involving the "public interest" contentions, and the argument that "Congress didn't intend to take rate-setting authority from the states" by § 1123 of the Bankruptcy Code, is simply misplaced. Congress already considered the public interest when it withdrew considerable regulatory authority from the states in its FERC legislation, as affirmed in the preemption decision by the Supreme Court in 1988 in *Mississippi Power & Light v. State of Mississippi*, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988). See also *Schneidewind*, 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988).

Like it or not, Congress has decreed that local rates *can* be determined indirectly by FERC in a FERC proceeding involving a "wholesale" generator of power, in determining the bulk rates to its affiliates that will then be passed through in retail rates, and it is up to the local state or PUC to intervene at FERC if they want to challenge the bulk power costs and rates. Congress apparently believes that regional requirements and regulation sometimes have to override local state requirements to have a rational power supply system in the country.[15]

This Court does not doubt or disparage in any way the serious responsibility devolving upon the New Hampshire Public Utilities Commission under State law to regulate the activities of a public utility company in accordance with the public interest as viewed by NHPUC and other State authorities. But a good and proper motive for state action is not by itself enough to defeat federal preemption in an appropriate case: "[T]he proper focus under the Supremacy Clause is not the avowed purpose for which the State adopts a given provision but the actual effect of the provision on the operation of a federal instrumentality and on its ability to achieve the objectives of federal law and policy for which it has been created." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 108 S.Ct. 1704, 1713, 100 L.Ed.2d 158 (1988), citing *Perez v. Campbell*, 402 U.S. 637, 651–52, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233, 243 (1971).

The *Perez* case, holding that the Arizona Motor Vehicle Safety Responsibility Act provisions were preempted by the discharge provisions of the Bankruptcy Act, provides strong support for the proposition that a state law unduly impeding the operation of the federal bankruptcy laws will be preempted, notwithstanding the strong public interest factor involved from the state's viewpoint. To reach its decision in the *Perez* case the Supreme Court had to overrule two prior decisions which it found were inconsistent with a "controlling principle" regarding federal preemption:

> We can no longer adhere to the aberrational doctrine of *Kesler* [*v. Department of Public Safety*, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962)] and *Reitz* [*v. Mealey*, 314 U.S. 33, 62 S.Ct. 24, 86 L.Ed. 21 (1941)] that state law may frustrate the operation of federal law as long as

---

14. See, infra, p. 888.

15. Regional regulation under FERC is also designed to harness competitive market forces in the most efficient generation at wholesale of electricity. See Phillips, *The Regulation of Public Utilities*, Public Utilities Reports, Inc., Arlington, Virginia, pp. 592–598 (1988). It is an open and currently-debated question as to whether regulation or competitive market forces (within a less restrictive regulatory framework) will best protect the public interest when dealing with public utilities. See Bonbright, Danielson, & Kamerschen, *Principles of Public Utility Rates*, Public Utilities Reports, Inc., Arlington, Virginia, pp. 29–30, 553–554, 582–584, 638–644 (2nd Ed.1988); *Phillips*, supra, pp. 583, 592, 799–804. See also Howard & Westfall, "The FERC Opens

Pandora's Box: Increased Competition and Heightened Antitrust Exposure for Electric Utilities", 121 *Public Utilities Fortnightly*, 22 (March 3, 1988); Gerber, "Questions for Regulators in a Competitive Electric Utility Environment", 122 *Pub. Util. Fort'y*, 11 (July 21, 1988); Comtois, "On the Necessity of Regulation", 122 *Pub. Util. Fort'y*, 13 (August 4, 1988); White & Vassell, "U.S. Electric Power Supply at the Crossroads— The Federal Energy Regulatory Commission Proposal", 123 *Pub. Util. Fort'y*, 9 (January 19, 1989); and Cudahy, "Return on Investment and Fairness in Regulation", 123 *Pub. Util. Fort'y*, 19 (February 2, 1989). Accordingly, it is anything but self-evident that the *only* way the public interest can be protected is by regulation by the NHPUC at the local level.

the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially further by the proposed state law. In view of the consequences, we certainly would not apply the *Kesler* doctrine in all Supremacy Clause cases. Although it is possible to argue that *Kesler* and *Reitz* are somehow confined to cases involving either bankruptcy or highway safety, analysis discloses no reason why the States should have broader power to nullify federal law in these fields than in others. Thus, we conclude that *Kesler* and *Reitz* can have no authoritative effect to the extent they are inconsistent with the controlling principle that any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.

*Id.* 402 U.S. at 651, 91 S.Ct. at 1712.

Even if the State of New Hampshire is correct in arguing that its displaced power to consider the public interest with regard to the restructuring of a regulated debtor is an important public policy factor which should be protected, it is at least arguable that a bankruptcy reorganization court *can* take into account the "public interest" in that sense in a confirmation hearing, even though that factor is not explicitly mentioned in the Code. This principle was established even before the enactment of the current Code. In *American United Mut. Life Ins. Co. v. City of Avon*, 311 U.S. 138, 145, 61 S.Ct. 157, 161–62, 85 L.Ed. 91 (1940), the Supreme Court stated:

As this Court stated in *Securities and Exchange Commission v. United States Realty & Improvement Co.*, 310 U.S. 434, 455 [60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940)]: "A bankruptcy court is a court of equity, § 2, 11 U.S.C. § 11, and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act.... A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest." And see *Pepper v. Litton*, 308 U.S. 295, 304 [60 S.Ct. 238, 244, 84 L.Ed. 281 (1939)], *et seq.* These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization, and the obtaining of assents thereto.

The Supreme Court has made a similar statement since the enactment of the Code. In *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482, (1984) the Court stated:

The Bankruptcy Court is a court of equity, and in making this determination it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. The Bankruptcy Court's inquiry is of necessity speculative and it must have great latitude to consider any type of evidence relevant to this issue.

A case illustrative of this principle is *In re Jewish Memorial Hosp.*, 13 B.R. 417 (Bankr.S.D.N.Y.1981). In this case, a certain creditor wanted immediate and full payment from the debtor hospital. The court denied the relief because payment would force the closing of the hospital. In making its ruling, the Court stated:

... a court of equity, exercising its discretion, may refuse specific enforcement of a valid individual right if the granting of such a right would be prejudicial to a paramount public interest.

*Id.* at 419.

With regard to the present case there is little question that the corporate reorgani-

zation and the future operations of the debtor electric utility company will have a large public impact upon the State of New Hampshire and its citizens. PSNH serves in excess of 350,000 electric power users in the State of New Hampshire, comprising some 71 percent of the State's residential electricity consumers, 82 percent of the State's commercial electricity consumers, and 81 percent of the State's industrial electricity consumers. The debtor's revenues constitute more than 75 percent of the total retail electric service revenues of all electric power utilities in the State of New Hampshire. In that context it is a least arguable that the "public interest" factor has continuing vitality in chapter 11 reorganizations under the 1978 Bankruptcy Code. See H.R.Rep. No. 95–595, 95th Cong., 1st Sess. pp. 5, 109, 220, 224, 228 (1977), U.S.Code Cong. & Admin.News 1978, 5787:

> The bill consolidates all four chapters into one business reorganization chapter (with some special provisions for railroad reorganizations) and rationalizes the various forms of relief available to a failing business, making a business reorganization a quicker, more efficient procedure, and providing greater protection for debtors, creditors, and the public interest.

Cf. *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 1008 (4th Cir.1986), *cert. denied* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1989), which used the "unquestioned public interest in promoting a viable reorganization of the debtor" as support for an injunction against nondebtor insurance companies which was essential to a confirmable plan of reorganization. See also, *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1071 (5th Cir.1986) ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commence-

ment, prosecution, and confirmation of bankruptcy proceedings.").[16]

It is not necessary for present purposes to decide if or how the "public interest" may be considered with regard to the confirmation of a plan of reorganization under chapter 11 of the Bankruptcy Code. It would be unwise to consider that matter outside of the context of a specific plan presented for confirmation pursuant to § 1129 of the Code.[17] It is enough to note as indicated at the outset of this discussion that the public interest *will* continue to be protected by the appropriate regulatory authorities with regard to the ongoing operations of the reorganized debtor and that that factor likewise does not have any *dispositive* importance in resolving the present case.

## VIII. STATUTORY CONSTRUCTION: "THE PLAIN MEANING RULE"

It is important to note with regard to the present case that we are not dealing with "preemption" as a discrete body of substantive law—whether constitutional or otherwise. The only question before the court is a pure question of statutory construction, i.e., *does* the statute in question when properly construed have the effect of preempting state law? If Congress so intends, and is acting within its plenary legislative powers, the statute *will* preempt by virtue of the Supremacy Clause. *Constitution,* Art. VI, cl 2. As expressed by Professor Tribe in his treatise: "So long as Congress acts within an area delegated to it, the preemption of conflicting state or local action—and the validation of congressionally authorized state or local action—flow directly from the substantive source of power of the congressional action coupled with the supremacy clause of article VI; such cases may pose complex ques-

---

**16.** See also, discussion in re *MCorp* decision, supra, pp. 867–69.

**17.** It is noted that the State of New Hampshire in oral argument at least indicates that it believes that a reorganization court *can* consider the public interest as part of the plan confirmation process. [Transcript Court Doc. No. 100,

Adv. No. 89–08, pp. 124–125.] I realize however that a contrary argument can be made from the change from prior Chapter X to present chapter 11 confirmation standards. Cf. also, *Bankruptcy Code* § 1173(a)(4). Of course there has never been a case of "displaced regulatory power" over a monopoly public utility debtor in a chapter 11 proceeding before either.

tions of statutory construction but raise no controversial issues of power." Tribe, *supra*, p. 479.

■ Congress, of course, has plenary powers in the bankruptcy area by virtue of the bankruptcy power provision quoted above. *Constitution*, Art. I, Sec. 8, cl. 4.[18] Thus, if it is determined that Congress intended preemption, the courts have no power to gainsay that legislative determination under some concept of judicial review of the wisdom of the particular federal-state balancing decision involved.[19] That balancing is essentially a political determination to be made by a Congress composed of representatives of the several states. Cf. *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 547–55, 105 S.Ct. 1005, 1015–20, 83 L.Ed.2d 1016 (1985) (Commerce Clause); *South ·Carolina v. Baker*, 485 U.S. 505, 108 S.Ct.

1355, 1360–61, 99 L.Ed.2d 592 (1988) (Tenth Amendment).[20]

■ Generally speaking, the "plain meaning rule" will be applied in the federal courts to statutory language free from ambiguity, notwithstanding policy arguments presented by those contending for an interpretation contrary to the apparent thrust of the language selected by the legislature. The most recent pronouncements by the Supreme Court on this issue in the bankruptcy area make this clear.

The decision in *United States v. Ron Pair Enter., Inc.*, — U.S. —, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), is apposite. In this case, the Court read Section 506(b) of the Bankruptcy Code[21] as allowing postpetition interest on an oversecured non-consensual prepetition claim. In making its ruling, the Court emphasized the plain lan-

**18.** As early as 1877, in construing a bankruptcy statute which predated the Bankruptcy Act of 1898, the Supreme Court noted the broad plenary power of Congress with regard to bankruptcy legislation in the decision in *United States v. Fox*, 95 U.S. 670, 672, 24 L.Ed. 538 (1877): "And as it is authorized 'to establish uniform laws on the subject of bankruptcies throughout the United States, it may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt [sic] system."

**19.** It should be noted that the present case does not implicate the Eleventh Amendment, and sovereign immunity questions pertaining to the states, in which the Supreme Court has fashioned a rule of law that Congress' intent to override must be expressed in "unmistakable terms". See *Astascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Will v. Michigan Department*, — U.S. —, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Hoffman v. Connecticut Department*, — U.S. —, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989). Therefore, the citation of *Astascadero* and its progeny by the State of New Hampshire in the present matter is not relevant. Those cases are truly *sui generis.*

**20.** In the *Garcia* decision 469 U.S. at pp. 551–52, 556, 105 S.Ct. at pp. 1017–18, 1020, the Supreme Court went back to the views of the Framers of the Constitution and the comments of James Madison in this regard:

Madison placed particular reliance on the equal representation of the States in the Senate, which he saw as "at once a constitutional recognition of the portion of sovereignty remaining ĭn the individual States, and an instrument for preserving that residuary sover-

eignty." The Federalist No. 62, p. 408 (B. Wright ed. 1961). He further noted that "the residuary sovereignty of the States [is] implied *and secured* by that principle of representation in one branch of the [federal] legislature" (emphasis added). The Federalist No. 43, p. 315 (B. Wright ed. 1961). See also *McCulloch v. Maryland*, 4 Wheat, 316, 435 [4 L.Ed. 579] (1819). In short, the Framers chose to rely on a federal system in which special restraints on federal power over the States inhered principally in the workings of the National Government itself, rather than in discrete limitations on the objects of federal authority. State sovereign interests, then, are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power.

\* \* \* \* \* \*

But the principal and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides through state participation in federal governmental action. The political process ensures that laws that unduly burden the States will not be promulgated.

**21.** Section 506(b) provides:

"(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such *claim, and* any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." (emphasis supplied)

guage of the statute with a reading compelled by the punctuation (notwithstanding an allegedly "misplaced" comma) employed by the legislative drafters. The court stated:

> The task of resolving the dispute over the meaning of § 506(b) begins where all such inquiries must begin: with the language of the statute itself. *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985). In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, "the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

> \*　　\*　　\*　　\*　　\*　　\*

> The plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce result demonstrably at odds with the intention of its drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

*Id.* —— U.S. at ——, ——, 109 S.Ct. at 1030, 1031, 103 L.Ed.2d at 298, 299. Cf. *Mansell v. Mansell,* —— U.S. ——, ——, 109 S.Ct. 2023, 2031, 104 L.Ed.2d 675, 688 (1989) ("Our task is to interpret the statute as best we can, not to second guess the wisdom of the congressional policy choice").

In the *Ron Pair* decision, the Court distinguished the bankruptcy decisions of *Midlantic Nat'l Bank v. New Jersey Dept. of Envt. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) and *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), in which the Court found well-established *judicial* interpretations of the prior Bankruptcy Act were not intended to be abrogated by the 1978 Bankruptcy Code. The *Ron Pair* court explained:

> Both decisions concerned statutory language which, at least to some degree, was open to interpretation. Each involved a situation where bankruptcy law, under the proposed interpretation, was in clear conflict with state or federal laws of great importance. In the present case, in contrast, the language in question is clearer than the language at issue in *Midlantic* and *Kelly:* as written it directs that postpetition interest be paid on all oversecured claims. In addition, this natural interpretation of the statutory language does not conflict with any significant state or federal interest, nor with any other aspect of the Code.... There is no reason to suspect that Congress did not mean what the language of the statute says.

*Id.* —— U.S. at —— 109 S.Ct. at 1032–33, 103 L.Ed.2d at 301. Thus, the *Midlantic* and *Kelly* cases, relied upon by the present defendants, are not useful here because unlike the case before this Court they involved well-established pre-Code judicially-made law and statutes that were ambiguous on their face.

More important in resolving the dispute before this Court are cases involving clear statutory language. Another recent Supreme Court bankruptcy case with pertinent observations in this regard is *United Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In that case the Court decided that Section 362(d) of the Bankruptcy Code did not require an undersecured creditor to receive "adequate protection" payments for the loss or delay of its right to foreclose on its collateral. In making its ruling the Court looked primarily at the statutory language, ignoring conflicting legislative history references, and found:

> Such generalizations [from legislative history statements] are inadequate to overcome the *plain textural indication* in §§ 506 and 362(d)(2) of the Code [is] that Congress did not wish the undersecured creditor to receive interest on his collateral during the term of the stay.

*Id.* 108 S.Ct. at 634, 98 L.Ed.2d at 754. (emphasis added).

An earlier pertinent Supreme Court decision involving the bankruptcy laws appears in *Central Trust Co. v. Creditors Committee,* 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d

542 (1982), in which the Court held that § 403(a) of the Bankruptcy Reform Act of 1978 (dealing with the effect of the new law on pending cases) makes *no* exception for petitions to be refiled under the new Bankruptcy Code. Accordingly, the Supreme Court reversed a court of appeals decision which allowed a case filed under the old Act to be refiled under the new Code. In construing this provision of the Bankruptcy Reform Act of 1978, the Supreme Court commented:

> The language of § 403(a) is unequivocal. It provides that cases filed under the Bankruptcy Act *"shall* be conducted and determined under such Act as if [the New Code] had not been enacted." It makes *no* exception for petitions to be refiled under the New Code; indeed, it expressly provides that petitions such as Geiger's *"shall* continue to be governed" by the Bankruptcy Act. Any exception to this mandate recognized by the Court of Appeals is of wholly judicial creation, supported by neither the language of the New Code nor its legislative history.

\* \* \* \* \* \*

Thus, the Court of Appeals erred when it "amended" § 403(a) to permit refiling under the New Code if such refiling would not actually prejudice the creditors. That the Court of Appeals thought consolidation of Geiger's petition with those of its subsidiaries and affiliates would serve the best interests of the estate, or would conserve judicial resources, does not justify its disregard of a clear congressional directive. "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485 [37 S.Ct. 192, 194, 61 L.Ed. 442] (1917). While the Court of Appeals may have reached a practical result, it was a result inconsistent with the unambiguous language used by Congress.

*Id.* 454 U.S. at 357–60, 102 S.Ct. at 696–98, 70 L.Ed.2d at 546–48.

It is true that there have been shifting currents in the Supreme Court over the years in bankruptcy and non-bankruptcy cases as to how strictly the plain meaning rule should be applied. However, the recent trend of decisions is to apply the rule strictly. See *United States v. Monsanto,* — U.S. ——, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); *Mead Corp. v. Tilley,* — U.S. ——, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989); *Mansell v. Mansell,* — U.S. ——, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989). Indeed, the Supreme Court has recently stated they will not "narrow the plain meaning of even a criminal statute on the basis of a gestalt judgment as to what Congress probably intended." *Garcia v. United States,* 469 U.S. 70, 78, 105 S.Ct. 479, 484, 83 L.Ed.2d 472, 480 (1984). See also *Pacific Gas & Electric Co. v. Energy Resources Comm'n,* 461 U.S. 190, 216, 103 S.Ct. 1713, 1728, 75 L.Ed.2d 752, 772 (1983) ("... inquiry into legislative motive is often an unsatisfactory venture. *United States v. O'Brien,* 391 U.S. 367, 383 [88 S.Ct. 1673, 1682, 20 L.Ed.2d 672] (1968). What motivates one legislator to vote for a statute is not necessarily what motivates scores of others to enact it.").

Even where the Supreme Court construes a statute which involves a subject like domestic relations law, in an area in which Congress "rarely intends to displace state authority" the Court will nevertheless enforce the plain meaning rule to a federal statute which has clear and unambiguous language. *Mansell v. Mansell,* — U.S. ——, 109 S.Ct. 2023, 2027, 104 L.Ed.2d 675, 684 (1989). That case dealt with clear statutory language and a lack of legislative history, much like our case. In construing a military compensation statute the Court stated:

> [t]he absence of legislative history on this decision is immaterial in light of the plain and precise language of the statute; Congress is not required to build a record in the legislative history to defend its policy choices.

*Id.* — U.S. at ——, 109 S.Ct. at 2030, 104 L.Ed.2d at 687.

The Supreme Court has amplified that position to include cases in which the legislative history included a history of prior unenacted bills on the subject. As stated in *Mead Corp. v. Tilley*, — U.S. ——, —— 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796, 806 (1989):

> We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because "mute intermediate legislative maneuvers" are not reliable indicators of congressional intent. *Trailmobile Co. v. Whirls*, 331 U.S. 40, 61, 67 S.Ct. 982, 992, 91 L.Ed. 1328 (1947); see also *Drummond Coal Co. v. Watt*, 735 F.2d 469, 474 (CA11 1984).

■ Thus, when Congress changes a prior statute with clear statutory language, the new statute will be given effect even though there is no legislative history supporting the change. Legislative silence in this sense cannot defeat the plain meaning of the language actually selected and enacted. Cf. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978) ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.").

Not surprisingly, the Circuits are following the Supreme Court's lead. For example, the First Circuit Court of Appeals in *Director v. Bath Iron Works Corp.*, 885 F.2d 983, 988 (1st Cir.1989), in construing a federal workman's compensation statute for longshoremen, recently stated:

> The statute's language is complex, but the problem with which it tries to deal is complex as well, and we cannot find any obvious drafting mistake in the language. Faced with language that is fairly clear and a statute that makes reasonable sense when one gives the statute's words their natural meaning, we must apply the statute as it is written.

Indeed, one Circuit Court recently faced with a question of interpretation of the Bankruptcy Code stated that if the statute is clear Congress is not required to provide additional comments in the legislative history to emphasize its intent to have its selected statutory language enforced. In *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186, 1196 (7th Cir.1989), the Seventh Circuit stated:

> Yet "[i]t is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history". *Pittston Coal Group v. Sebben*, — U.S. ——, ——, 109 S.Ct. 414, 420–21, 102 L.Ed.2d 408 (1988). See also, e.g., *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 591–92, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980); *Swain v. Pressley*, 430 U.S. 372, 378–79, 97 S.Ct. 1224, 1228–29, 51 L.Ed.2d 411 (1977). When Congress makes wholesale changes in the text and structure of the law, it is fatuous to pretend that a silent legislative history means that existing practices should continue unchanged.

■ There is a recognized exception to the plain meaning rule in constructing statutes: when the literal language of the statute will lead to patently absurd results. As stated in *Public Citizen v. Department of Justice*, — U.S. ——, ——, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377, 391–92 (1989):

> As we said in *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), "frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

Where the literal reading of a statutory term would "compel an odd result," *Green v. Bock Laundry Machine Co.*, 490 U.S. ——, ——, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989), we must search

for other evidence of congressional intent to lend the term its proper scope. See also, *e.g. Church of the Holy Trinity, supra,* 143 U.S., at 472, 12 S.Ct., at 516; *FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 432, 106 S.Ct. 1931, 1935, 90 L.Ed.2d 428 (1986).

However, there is no contention by the defendants here that the argued preemptive effect of § 1123(a)(5) of the Bankruptcy Code would lead to a result so absurd that Congress could not have intended the same. Whether the federal-state balancing chosen by Congress in this regard was wise may be debatable but such a policy dispute does not justify a disregard for the statutory language under the exception to the rule.[22]

In short, the fact that Congress may not have fully thought out all possible applications of its legislative act—and did not in fact focus on the *precise* problem now presented to the courts for interpretation—does not justify a disregard for the statutory language actually employed in an attempt to "manufacture" a specific intent for Congress in the guise of statutory construction. See *Maine v. Thiboutot,* 448 U.S. 1, 8, 100 S.Ct. 2502, 2506, 65 L.Ed.2d 555, 561–62 (1980) ("Congress was aware of what it was doing, and the legislative history does not demonstrate that the plain language was not intended. Petitioners' arguments amount to the claim that had Congress been more careful, and had it fully thought out the relationship among the various sections, it might have acted differently."). See also *Securities Indus. Ass'n. v. Connolly,* 883 F.2d 1114, 1118–19 (1st Cir.1989). ("Because the language of the Act seems clear, and its meaning plain, we are not obliged to plumb the Congress's collective consciousness to ascertain legislative intent."); *Barr v. United States,* 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765 (1945) ("But if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not

have been contemplated by the legislators.").

Finally, the Supreme Court has expressly rejected legislative "silence" as a determinative factor in statutory construction in the decision in *Pittston Coal Group v. Sebben,* —— U.S. ——, ——, 109 S.Ct. 414, 420–21, 102 L.Ed.2d 408, 420–21 (1988), stating:

The Secretary goes further still, however, and argues that the legislative history leading up to the enactment of the BLBRA actually discloses a congressional intention to preserve only *"medical criteria"* in the adoption of § 902(f)(2). We need not canvass in detail that legislative history, which shows at most that medical criteria were the focus of the House and Senate debates. *It is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history,* and the text of the present statute plainly embraces criteria of more general application. (emphasis supplied)

The Court in *Pittston* also indicated that little weight should be given to floor statements by legislators following the enactment of a federal statute:

... we do not sit to determine what Congress ought to have done given the evidence before it, but to apply what Congress enacted—and, as we have discussed, the exclusion of short-term miners from the benefits of the presumption finds no support in the statute. The Secretary and private petitioners cite favorable postenactment statements by key sponsors of the BLBRA. Since such statements cannot possibly have informed the vote of the legislators who earlier enacted the law, there is not more basis for considering them than there is to conduct postenactment polls of the original legislators.

*Id.* —— U.S. at ——, 109 S.Ct. at 422, 102 L.Ed.2d at 423.

The Supreme Court has recently emphasized that silence in legislative history re-

---

22. See discussion, supra, p. 874. See also *Crooks v. Harrelson,* 282 U.S. 55, 60 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930), to the effect that that

exception to the plain meaning rule required "absurdity ... so gross as to shock the general moral or common sense."

garding a particular statutory change is particularly irrelevant for statutory construction purposes when the change is part of a major recodification of a statutory subject area. As the court noted in *United States v. Ron Pair Enterprises, Inc.,* —— U.S. ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989): "In such a substantial overhaul of the system [the 1978 Bankruptcy Code] it is not appropriate or realistic to expect Congress to have explained with particularity each step it took."

## IX. PREEMPTION GENERALLY

The plain meaning rule for statutory construction applies to preemption statutes as well as other federal laws. For example, in deciding whether the federal "CERCLA" environmental law preempted a state environmental statute the Supreme Court, in *Exxon Corp. v. Hunt,* 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986) stated:

> When a federal statute unambiguously precludes certain types of state legislation, we need go no further than the statutory language to determine whether the state statute is preempted.

*Id.* 475 U.S. at 362, 106 S.Ct. at 1109, 89 L.Ed.2d at 374.

This case relied on the earlier decision of *Aloha Airlines, Inc. v. Director of Taxation,* 464 U.S. 7, 104 S.Ct. 291, 78 L.Ed.2d 10 (1983). In this case, the Court held a federal statute expressly preempted a state statute that imposed a tax on the gross income of airlines operating within Hawaii. The Court remarked:

> [w]hen a federal statute unambiguously forbids the States to impose a particular kind of tax on an industry affecting interstate commerce, courts need not look beyond the plain language of the federal statute to determine whether a state statute that imposes such a tax is preempted.

*Id.* 464 U.S. at 12, 104 S.Ct. at 294, 78 L.Ed.2d at 15.

Nevertheless, as the State correctly and cogently argues, federal courts should exercise caution in declaring that federal statutes preempt state laws in view of the importance of federal-state balancing questions in our dual-sovereignty governmental system. The leading case for this proposition is *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). In this case, the court had to decide whether a state's packaging laws were preempted by federal laws regulating net-weight labeling. The Court stated the parameters of preemption analysis as follows:

> Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, see, *e.g.,* U.S. Const., Art. I, § 10; *Patapsco Guano Co. v. North Carolina,* 171 U.S. 345, 358 [18 S.Ct. 862, 867, 43 L.Ed. 191] (1898), "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.* 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). This assumption provides assurance that "the federal-state balance," *United States v. Bass,* 404 U.S. 336, 349 [92 S.Ct. 515, 523, 30 L.Ed.2d 488] (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts. But when Congress has "unmistakably ... ordained," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), that its enactments alone are to regulate a part of commerce, state law regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.

*Id.* 430 U.S. at 525, 97 S.Ct. at 1309, 51 L.Ed.2d at 614. See also *California v. ARC America Corp.,* —— U.S. ——, ——, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94–95 (1989).

As indicated in the last sentence of the quotation from the *Rath Packing* case, the caution which a federal court should exercise in dealing with preemption involving federal and state authorities does not prevent a finding of preemption where the Congressional intent is clear. The Su-

preme Court has squarely held that express preemption found in a federal statute will be enforced notwithstanding disruption of important state interests. See *Exxon Corp. v. Hunt, supra,* 475 U.S. at 362, 371–74, 106 S.Ct. at 1313–15 (1986); *Aloha Airlines, Inc. v. Director of Taxation, supra,* 464 U.S. at 12, 104 S.Ct. at 294.

Moreover, it has been held that the caution used when looking for preemptive intent is not as strong when the federal law and Constitution create a "uniquely federal interest." In *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Court found procurement of military equipment to be one of these interests. The Court stated as follows:

> In most fields of activity, to be sure, this Court has refused to find federal pre-emption of state law in the absence of either a clear statutory prescription, see, e.g., *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), or a direct conflict between federal and state law, see, e.g., *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). But we have held that a few areas, involving "uniquely federal interest," *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981), are so committed by the Constitution and laws of the United States to federal control that state law is preempted and replaced, where necessary by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called "federal common law."

*Id.* 487 U.S. at ―――――, 108 S.Ct. at 2513–14, 101 L.Ed.2d at 452–53. Cf. *Clearfield Trust v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 575, 87 L.Ed. 838, 841 (1943); *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 595, 93 S.Ct. 2389, 2398, 37 L.Ed.2d 187, 196 (1973);

*Howard v. Lyons,* 360 U.S. 593, 597, 79 S.Ct. 1331, 1333–34, 3 L.Ed.2d 1454, 1457 (1959).

A strong federal interest is present in our case because the subject matter is bankruptcy, upon which the Constitution allows the federal government to legislate uniform laws. Support for this conclusion is found by analogy in a recent decision by the District Court for New Hampshire. In *Davis v. Britton,* 729 F.Supp. 189 (D.N.H. 1989), the Court found that a federal maritime tort statute preempted state probate statutes regarding the time within which claims could be filed. In making its ruling the court, at page 191 of its opinion, stated:

> Admiralty and maritime law, are areas in which Congress has created a broad scheme of legislation and has expressed a particular interest in developing *uniform laws* which would remove the "discrepancies" resulting from the application of state statutes. (emphasis added)

Congress in enacting the Bankruptcy Code of course also is acting to provide "uniform laws" on that subject under one of its plenary powers. *Constitution,* Art. I, Sec. 8, cl. 4.

There are two methods of preemption: express and implied. There are several types of implied preemption. A recent Supreme Court case describing the various types of preemption is *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). In deciding whether blood plasma centers could be subject to state regulation with existing federal regulation already in place the Court explained:

> Under the Supremacy Clause, federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604] (1977). In the absence of express pre-emptive language, Congress' intent to preempt all state law in a particular area may be inferred where the scheme of federal

regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). Pre-emption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Ibid.;* see *Hines v. Davidowitz*, 312 U.S. 52 [61 S.Ct. 399, 85 L.Ed. 581] (1941).

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248] (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz, supra,* [312 U.S. at 67 [61 S.Ct. at 404]. See generally *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698–699 [104 S.Ct. 2694, 2699–2700, 81 L.Ed.2d 580] (1984).

*Id.* 471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d at 721.

Other cases have similarly defined the variety of types of preemption as well. See, e.g., *Northwest Central Pipeline Corp. v. State Corp. Comm'n,* —— U.S. ——, ——, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509, 526–27 (1989); *California v. ARC America Corp.,* —— U.S. ——, ——, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94 (1989); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299–300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316, 325 (1988); *Louisiana Pub. Serv. Comm'n v. FCC*, 476

U.S. 355, 368–69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369, 381–82 (1986); *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443, 452 (1984); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 2 (1st Cir.1989); *Wood v. General Motors Corp.*, 865 F.2d 395, 401 (1st Cir.1988).

### X. EXPRESS PREEMPTION

■ With regard to the present statutory provision before this court, i.e., § 1123(a)(5) providing that "notwithstanding any otherwise applicable nonbankruptcy law" a plan of reorganization "shall" contain adequate provisions for the plan's implementation, in terms of the necessary restructuring of the debtor and its assets and liabilities common to all plans of reorganization in complex cases, the statute would seem to be plain on its face to indicate an express preemptive intent as to such restructuring provisions of a chapter 11 plan of reorganization.

The State of New Hampshire does not really argue to the contrary, in terms of the literal language of § 1123(a)(5), but argues that that literal language is softened or abrogated by the provisions of §§ 1141 and 1142 dealing with post-confirmation effects and transactions. But that argument only has meaning if a question of *implied* preemption is involved.[23] In terms of the literal language of § 1123(a)(5) it seems obvious that that section on its face contemplates that restructuring transactions necessary to a plan of reorganization may be provided notwithstanding nonbankruptcy law, and that upon confirmation of the plan pursuant to § 1129(a) of the Bankruptcy Code the confirmed plan—and the *reorganized* debtor *created* thereby—will be governed by those provisions.[24]

Support for this conclusion can be found in a recent decision of the Fourth Circuit, *Universal Cooperatives, Inc. v. FCX, Inc.*,

---

**23.** See discussion, infra, pp. 884–87.

**24.** When Congress wanted to make nonbankruptcy law inapplicable in bankruptcy court proceedings it knew how to do that explicitly—apart from the § 1123(a)(5) provision here in question. See 11 U.S.C. §§ 541(c)(1), 927, 1123, 1125(d), 1142. Likewise, when Congress intends to make clear that nonbankruptcy law *is* applicable in bankruptcy proceedings it knows how to do so, and has done so often, in explicit fashion. See 11 U.S.C. §§ 101(52), 108, 363(f)(1), 365(c)(3), 365(h)(1), 365(n), 510, 522(b)(2)(B), 524(c), 524(d)(1)(A), 541(c)(2), 552(b), 943, 1126.

853 F.2d 1149 (4th Cir.1988), cert. denied —— U.S. ——, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989).[25] In this case, the Court held that Section 1123 preempted certain state law requirements for corporate transfer of collateral. The court stated:

> Because "Congress may ... abrogate state law entitlements in bankruptcy pursuant to its Bankruptcy Clause Power, U.S. Const. art. I, § 8, cl. 4," *In re Farmers Markets*, 792 F.2d at 1403, we must ask further whether there exists any conflicting bankruptcy law which overrides the discretionary power over the redemption of the patronage certificates vested in Universal's board by state law and its by-laws. FCX here contends that § 1123(a)(5)(D) preempts the restrictive provisions of Universal's by-laws and allows it to release the patronage certificates in satisfaction of Universal's claim.

Section 1123(a)(5)(D) provides, among other things, for the distribution of collateral which is property of the estate to a party holding a security interest in the collateral in satisfaction of that party's secured claim. Prior to 1984, § 1123(a)(5)(D) read as follows.... [quotation omitted].... In 1984, the opening clause of § 1123(a) was amended to read: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall...." By its plain language then, § 1123(a)(5)(D) overrides nonbankruptcy law restrictions on the distribution of collateral to satisfy a claim secured by the same. Accordingly, § 1123(a)(5)(D) supersedes the discretionary power over surrender of the patronage certificates bestowed on Universal's board by its by-laws.

*Id.* at 1154.

In making its decision, the Court in *FCX* emphasized that Section 1123 is an *empowering* statutory provision, and is not merely descriptive of plan contents. The Court remarked:

> § 1123(a)(5) is an empowering statute.... [it] does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate.

*Id.* at 1155. See also *In re Sweetwater*, 884 F.2d 1323, 1326 (10th Cir.1989).

The *Collier on Bankruptcy* treatise also refers to the empowering nature of § 1123 of the Bankruptcy Code:

> The alternatives set forth in section 1123(a)(5) are self-executing. That is, the plan my propose such actions notwithstanding non-bankruptcy law or agreements.... if the plan provides for liquidation, merger, or issuance of stock, such actions are authorized under the Code and approval required under nonbankruptcy law is unnecessary.

5 *Collier on Bankruptcy* paragraph 1123.-01, at 1123–10 to 1123–11 (15th ed. 1988). *See also* 5 *Collier on Bankruptcy* paragraph 1123.02[4] (15th ed. 1988) (noting that 11 U.S.C. § 1123(b)(4), which permits a plan to provide for the sale of all or substantially all assets, "applies even if the debtor provides essential public service such as a utility or railroad.").

Contrary to the *FCX* decision, and the *Collier* discussion, the defendants make

---

**25.** *FCX* apparently is the only case that has any meaningful discussion of the provisions of 1123(a)(5) for present purposes. But see *Valente v. Savings Bank of Rockville*, 34 B.R. 362, 365–66 (D.Conn.1983) (construing § 1123(a)(5)(G) re curing defaults); *In re Entz White Lumber & Supply, Inc.*, 850 F.2d 1338 (9th Cir.1988) (also construing § 1123(a)(5)(G)); *Kizzac Management Corp.*, 44 B.R. 496, 504 (Bankr.S.D.N.Y.1984) (construing § 1123(a)(5)(E)). The Courts have recognized that "notwithstanding" language in other portions of the Bankruptcy Code should be interpreted in accordance with its plain preemptive meaning. See, e.g., *In re Computer Communications, Inc.*, 824 F.2d 725, 730 (9th Cir.1987) (Section 541); *In re Corky Foods Corp.*, 85 B.R. 903, 904 (Bankr.S.D.Fla.1988) (Section 365); *In re Miller*, 68 B.R. 385, 387 (Bankr.W.D.Penn.1986); *In re Wheeling–Pittsburg Steel Corp.*, 72 B.R. 845, 848 (Bankr.W.D.Penn 1987) ("Additionally, to the extent that state public utility laws conflict with the bankruptcy laws regarding rejection of executory contracts [section 365] it is clear that the state laws must give way to the federal bankruptcy laws by virtue of the Supremacy Clause.").

the argument that the section 1123 heading "Contents of Plan" should limit the otherwise clear meaning of the statute. This argument is not very persuasive due to the clarity of the text [26] and the little case law available which suggests that titles cannot contradict the meaning of clear text. See *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947); *Scarborough v. Office of Personnel Management*, 723 F.2d 801 (11th Cir.1982); *United States v. Carrillo-Colmenero*, 523 F.2d 1279 (5th Cir. 1975). As the *Scarborough* court stated:

> [R]eliance on headings is not a favored method of statutory construction. Section headings cannot limit the plain meaning of the text and may be utilized to interpret a statute, if at all, only where the statute is ambiguous ... resort to statute headings to contradict plain language of the statute is inappropriate.

*Id.* at 811–12.

Moreover, since the language of Section 1123 is obviously intended to provide for plans that could go forward for confirmation subject only to the requirements of section 1129—including the rate approval power of a state regulatory agency—it would be nonsensical to interpret Section 1123 to simply list what a plan may include but with the result that such a plan could not be confirmed.[27] Cf. *Connecticut v. Schweiker*, 684 F.2d 979, 993 (D.C.Cir. 1982), *cert. denied* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983) in which the Court rejected an argument that a federal statute providing "notwithstanding any other provision of law" there was no time limit for the filing or payment of certain claims did not mean what it said. The result in *Schweiker* was reached even though it appeared that Congress "did not focus on" the particular situation present before the Court. *Id.* at 993.

It is significant for present purposes that in *the one statutory provision* in chapter 11 of the Bankruptcy Code where Congress specifically focused on the extent to which a plan for a public utility should be subject to regulatory approval (i.e., § 1129) it required approval of only *rate changes* provided in the plan. *Bankruptcy Code*, § 1129(a)(6). Moreover, that specific requirement of regulatory approval was expressed in terms of a regulatory commission with jurisdiction "after confirmation of the plan" with regard to rates to be charged by the reorganized debtor.

The State also argues that since Congress chose not to enact certain drafts of bankruptcy legislation in the mid–1970's that would have preempted regulatory agencies from public utility plans of reorganization, then Congress must not have wanted to preempt such regulatory authorities. Unfortunately, the Supreme Court rejects such arguments. In *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), the Court was confronted with the same argument, and the Court concluded it "is generally reluctant to draw inferences from Congress' failure to act." *Id.* 485 U.S. at 306, 108 S.Ct. at 1154, 99 L.Ed.2d at 329.[28] The

---

**26.** The only recent Supreme Court case giving any weight to a section heading is *Mead Corp. v. Tilley*, — U.S. —, —, 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796, 806 (1989). But the Court did that because the text was ambiguous.

**27.** The State of New Hampshire gives no "other meaning" to the § 1123 language that has any weight. The court would in effect have to amend the statute to reach the "practical result" that the State of New Hampshire feels is appropriate. However, in *Central Trust Co. v. Official Creditors' Comm.*, 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982) the Supreme Court reversed the court of appeals for doing just that with regard to Chapter XI of the prior Bankruptcy Act. This was not a preemption case but it does

indicate a strict enforcement of the plain meaning rule.

**28.** The defendants note that the undersigned judge in *In re Keniston*, 85 B.R. 202 (Bankr.D.N. H.1988), in a statutory construction case gave consideration to the history of prior unenacted bills. 85 B.R. at 217–22. However, the provisions of § 707(b) of the Bankruptcy Code, as construed in the *Keniston* decision, were widely-recognized to be highly ambiguous and in my judgment under an expansive reading would have abrogated the "fresh start" policy judicially established under all prior bankruptcy laws since the Bankruptcy Act of 1898. That situation is in no way comparable to the present case.

Court then went on and stated that it was just as plausible that members of Congress believed the statute as written was sufficiently clear to preempt the statutes so the added language was unnecessary. *Id.* 108 S.Ct. at 1154. This precise reasoning also applies to our case. See also *Mead Corp. v. Tilley,* — U.S. — 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796 (1989).

In essence, the State is asking this Court to "add a clause" to clear statutory language to give the statute a meaning other than its apparent literal meaning. Yet, the Supreme Court has rebuked such attempts. See *American Tobacco Co.· v. Patterson,* 456 U.S. 63, 69, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748, 755 (1982) (statute will not be given limited effect contrary to plain language of statute). The federal courts in interpreting federal statutes do not have "a license for the judiciary to rewrite language enacted by the legislature." *United v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536, 542 (1985). See also *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206–07, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169, 179 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"); *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581, 587 (1978) ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted."); *SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 455–57, 60 S.Ct. 1044, 1053–54, 84 L.Ed. 1293 (1940); *Levit v. Ingersoll Rand Financial Corp.,* 874 F.2d 1186, 1197–98 (7th Cir.1989).

## XI. IMPLIED PREEMPTION

■ While believing express preemption has been established, the plaintiff argues if express preemption is found not to be sufficient, that implied preemption is also present in this case because the state regulatory requirements stand as an "obstacle" to Congress' preferred method of achieving bankruptcy reorganizations. It is important to remember, as stated by the Court of Appeals for this Circuit, that "a direct, facial contradiction between state and federal law is not necessary" to find implied preemption. *Securities Indus. Ass'n. v. Connolly,* 883 F.2d 1114, 1118 (1st Cir.1989). What is essential is that "'the state law disturbs too much the Congressionally declared scheme ...'" *Id.* (quoting *Palmer v. Liggett Group, Inc.,* 825 F.2d 620, 626 (1st Cir.1987)).

The "obstacle" type of implied preemption was found to exist in the recent First Circuit case of *Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir.1988). In this case, the issue was whether federal motor-vehicle safety laws, which established safety requirements for construction of certain vehicles, preempted a state product liability action. Specifically, whether the manufacturer of a vehicle which complied with the federal safety standard, by having a seat belt installed, could be sued under state law for not having an air bag installed. The Court found the tort action was impliedly preempted. It stated:

> We believe that this "stand as an obstacle" type of preemption preempts Wood's design defect claim based on the absence of an air bag. Even though the goal of Wood's design defect action might be the same as that of the Safety Act—that is, to increase automobile safety—Wood's theory of recovery is preempted by FMUSS 208 and the Safety Act because it interferes with the *method* by which Congress intended to meet this goal.

*Id.* at 408.

The First Circuit has found "obstacle" preemption with the goal of a federal statute in several other recent cases. See *Securities Indus. Ass'n v. Connolly,* 883 F.2d 1114 (1st Cir.1989) (federal arbitration statute preempted state arbitration regulations); *Hyde Park Partners v. Connolly,* 839 F.2d 837 (1st Cir.1988) (Williams Act preempted the Massachusetts anti-takeover statute); *Hernandez–Colon v. Secretary of Labor,* 835 F.2d 958 (1st Cir.1988) (Job Training Partnership Act preempted Puerto Rico law). See also *Perez v. Campbell,* 402 U.S. 637, 651, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233, 243 (1971) (state law frustrat-

ing operation of federal law will be preempted even though state legislature had significant purpose in mind other than frustration).

Particularly pertinent for our purpose are those decisions dealing with the preemptive effect of federal statutes (and federal regulatory agencies) on conflicting state regulatory agencies and their powers. Implied preemption was found in the following cases: *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988); *Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).

The most relevant case here is the *Schneidewind* decision cited. In this case, the Supreme Court held that the federal Natural Gas Act (NGA) impliedly preempted a Michigan statute which required that a public utility transporting natural gas for public use first obtain approval of the Michigan Public Service Commission before issuing long-term securities. The Court in *Schneidewind* gave a succinct statement of the "obstacle" form of implied preemption by federal statute:

> Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found " 'when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and

objectives of Congress, *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).' " *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580–82, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577 (1987), quoting *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984).

Cf. also *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) (state barred from setting retail rates that did not take into account FERC's allocation of power between two related utility companies).[29]

The defendants argue that §§ 1141 and 1142 of the Code, dealing with the effects of confirmation and the implementation of a plan, also must be given effect and that they defeat any implied "obstacle" preemptive effect of § 1123(a)(5) of the Code. Aside from the fact that such a reading arguably would render the § 1129 confirmation process an exercise in futility—which Congress could hardly have intended—there is a basis for reading the text of those statutory provisions (contrary to the more broad implications of their captions) in a more limited manner based on the actual textual language to harmonize those provisions with the provisions of §§ 1123 and 1129 of the Code.

The issue of course is whether § 1142 has any effect with regard to *undoing* the *creation* of the reorganized entity already accomplished under §§ 1123 and 1129 of the Bankruptcy Code. Section 1142(a), under Subchapter III of Chapter 11, entitled "Post-confirmation Matters", has been construed as dealing not with substantive provisions of a plan but rather with the effec-

---

**29.** Preemption was *not* found in the regulatory conflict situation in the following cases: *Northwest Central Pipeline Corp. v. State Corp. Comm'n*, —— U.S. ——, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989) (state regulation of natural gas production was not expressly or impliedly preempted by FERC authority); *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (state mining permit requirement was not expressly or impliedly preempted by federal laws); *Louisiana Public Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (state regulation for depreciating utility expenses was not expressly or impliedly preempted by FCC authority); *Arkansas Elec. Cooperative Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (state public service commission jurisdiction over wholesale rates was not expressly preempted by federal power statutes); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (state law regulating nuclear waste disposal is not impliedly preempted by federal laws).

tuation of a confirmed plan. See *Good-man v. Phillip R. Curtis Enterprises, Inc.*, 809 F.2d 228, 232 (4th Cir.1987); *In re Paradise Valley Club*, 26 B.R. 990, 992 (Bankr.D.Colo.1983), aff'd, 31 B.R. 613 (D.Colo.1983). It is therefore arguable that § 1142(a) is only in the statute because a § 1123 restructuring for § 1129 plan confirmation purposes does not authorize the reorganized company to *carry out* the plan in violation of net capital and other financial condition rules.

Considering all of the foregoing, it seems fair to state that the potential "obstacle" that the New Hampshire PUC laws represent in the present case is adequately encapsulated in two colloquies between the Court and the attorney for the State of New Hampshire during the final hearing in this matter:

THE COURT: Well, issuance of securities clearly is covered here, right?

MR. VAUGHN: Yes

THE COURT: It would be a strange corporate reorganization that did not include issuance of new securities and yet your regulatory [language] requires PUC approval for all new securities. How can both requirements exist? How can the Federal Court perform its function in confirming a plan when the State Regulatory Agency says, well, the new securities we have to approve.

MR. VAUGHN: I think the distinction is a regulated utility, Your Honor, is that the return on securities basically is a part of determining rates.

THE COURT: Right, which gets us back to the reason why they took the PUC's out of reorganization.

\* \* \* \* \* \*

THE COURT: [If] the PUC has the last say about everything, we may as well close up our tents and send it over to the PUC, let them reorganize this company and when they have approved it, send it over and I'll sign it. Come to think of it, that's not the worse option in the world but some people may think that's a horror.

MR. VAUGHN: Your, Honor, I think the company and everybody has been

talking about the veto which the State has, the State doesn't really have a veto. This is a Public Utilities Commission, it's legislatively founded on laws, they have regulations governed by Constitutional law, there's a direct appeal to the Supreme Court of the State of New Hampshire.

THE COURT: I didn't say arbitrary veto, it's a due process veto.

MR. VAUGHN: It's not a veto, a veto is discretionary.

THE COURT: Let's say the final decision on a restructuring and reorganizing of this debtor entity, your position is that, is it not?

MR. VAUGHN: It's a finding of public good.

THE COURT: So what is the point of a Chapter 11 reorganization then?

[Transcript, Court Doc. No. 100, AP. 89–08, pp. 114–115, 119–120]

## XII. CONCLUSION

It needs to be stated again that all that needs to be decided in the present proceeding is whether a plan of reorganization under chapter 11 of the Bankruptcy Code, which includes various restructuring provisions listed in § 1123(a)(5) ordinarily requiring approval by NHPUC, can nevertheless be part of a plan submitted for approval and confirmation pursuant to § 1129 of the Bankruptcy Code. More precisely, the question is whether "as a matter of law" such a plan could not be confirmed. It will be noted that the State of New Hampshire consistently refers to the "preemptive effect of § 1123" as the issue before the Court. However, the debtor more accurately frames the issue in terms of the question of preemptive effect involved as a result not only of § 1123 but also § 1129 of the Bankruptcy Code.

The debtor's strongest point is the unchallenged and fundamental fact that the PUCs and other regulatory agencies were taken out of the bankruptcy reorganization process by Congress in the 1978 Code. As noted in *Muscogee Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C.Cir.1988), cert. denied, — U.S. ——, 109 S.Ct. 795, 102 L.Ed.2d

786 (1989): "[w]here the words of a later statute differ from those of the previous one on the same or related subject, the Congress must have intended them to have a different meaning." This legislative history fact undergirds the debtor's position that the plain language of §§ 1123 and 1129 means what it says and does embody Congress' express legislative intent of preemption.[30] The debtor also correctly notes that the defendants have failed to give any alternative meaning to § 1123(a)(5) if it is not to have the effect argued for by the debtor.

The defendants also have failed to respond to the debtor's contention regarding the corroborating interpretative effect on § 1123(a)(5) and § 1129, under the *expressio unius est exclusio alterius* doctrine, by virtue of the *specific* references to necessary regulatory agency approvals in reorganization proceedings and in other portions of the Bankruptcy Code. See, *Bankruptcy Code*, §§ 901(a), 943(b)(6), 1129(a)(6), 1172(a), and 1172(b).[31] As the Supreme Court has commented with regard to the *expressio unius* doctrine: "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 432 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) quoting *Russello v. United States*, 464 U.S. 16, 23 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). *See also, United States v. Jones*, 567 F.2d 965, 967 (10th Cir.1977) ("if a statute specifies one exception to the general application, other exceptions are excluded....").

The defendants' strongest point is bottomed upon the unchallenged proposition, set forth in a number of Supreme Court cases cited above, to the effect that federal preemption should be cautiously approached when a federal-state balancing of respective governmental powers of the federal and state authorities is involved. As noted, this proposition received its most forceful expression in the *Rice v. Santa Fe Elevator Corp.*, supra, and its succeeding line of decisions, including the *Florida Lime Growers* and the *Rath Packing* cases. However, as the Supreme Court noted in *Aloha Airlines .v. Director of Taxation*, 464 U.S. 7, 12, 104 S.Ct. 291, 294, 78 L.Ed.2d 10 (1983), the *Rice* decision and its progeny only applies to *implied* preemptions.[32] It has been noted that the *Florida Lime* decision likewise should be given a limited interpretation.[33]

---

**30.** As noted above the Bankruptcy Act provided for state PUC approval of public utility reorganizations. But these approval provisions were removed for restructuring transactions in 1978. All that remains is approval for rates in Section 1129(a), (b).

**31.** While the defendants correctly cite the decision in *Timbers* for the proposition that construction of the Bankruptcy Code is a "holistic" endeavor [Court Doc. No. 87, Adv. No. 89–08, p. 14] their memorandum curiously has a "hole" in it, i.e., it is not wholly holistic in that it does not respond to the argument made by the plaintiff in this regard concerning the cited provisions of the Bankruptcy Code.

**32.** In the *Aloha Airlines* decisions the Court in reversing the decision below noted: "The Hawaii Supreme Court apparently considered itself obliged by *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), and its progeny to examine thoroughly Congress' intentions before declaring Haw.Rev.Stat. § 239-6 pre-empted. *In re Aloha Airlines, Inc.*, 65 Haw. 1, 13–16, 647 P.2d 263, 272–73 (1982).

*Rice* and its progeny, however, involved the implicit pre-emption of state statutes. Rules developed in these cases apply when a court must decide whether a state law should be pre-empted even though Congress has not expressly legislated pre-emption." 464 U.S. at 12, 104 S.Ct. at 294, footnote 5.

**33.** Professor Tribe in his Treatise, *American Constitutional Law*, § 6.26, p. 496 (2d Ed.1988), comments with regard to this decision:

"Given the difficulty of perceiving the California regulation as anything but an obstacle to full enforcement of the federal scheme, the result in *Florida Lime & Avocado Growers* should probably be understood as deriving from concerns that the Court noted but did not expressly deem dispositive: The federal marketing rules for Florida avocados has not been drafted 'by impartial experts in Washington or even in Florida, but rather by the South Florida Avocado Administrative Committee,' a self-interested committee of Florida growers and handlers who sought to promote orderly marketing and competition among the South Florida growers in the exercise of

The defendants also point out that the Supreme Court has repeatedly indicated "we start with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" as stated in *Hillsborough County v. Automated Medical, Inc.*, 471, U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985), quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), further quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). But this general proposition is limited by its introduction. Courts do "start with the assumption" indicated but that assumption will not prevent preemption when Congress has expressly indicated its preemptive intent—even in the police powers context.[34]

For example, it should also be noted that in *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), the Supreme Court—notwithstanding the language cited by the defendants in the present case—actually held that the Federal Meat Inspection Act and other federal statutes there involved *did* have a preemptive effect with regard to a California Business & Professions Code provision regulating the average weight and measure of contents of containers of commodities at time of sale.

At bottom, the defendants are contending in effect that Congress enacting § 1123(a)(5) of the Bankruptcy Code should have said "And we mean it too!" in the text, in the reports, or on the floor. However, as noted in the *Pittston* decision, supra, "It is not the law" that Congress need be that explicit in either its language or legislative history if the language is clear and unambiguous. —— U.S. at ——, 109 S.Ct. at 420, 102 L.Ed.2d at 420. It must remembered that the language of § 1123(a)(5) should be read in the context of the major recodification of bankruptcy law accomplished by Congress, after a long period of study, with the enactment of the Bankruptcy Reform Act of 1978. The 1978 Bankruptcy Code did in fact "shrink" the previous involvement of governmental entities generally—in terms of their required approvals in corporate reorganization proceedings—and § 1123(a)(5) is entirely consistent with that process.[35]

Finding federal preemption by virtue of § 1123(a)(5) and § 1129 of the Bankruptcy Code is not a particularly surprising development in any event—even in terms of a possible shift of regulatory authority over rates from NHPUC to FERC with regard to wholesale rates—in view of the dual regulatory system created by Congress for public utilities in this country since the enactment of the Federal Power Act of 1935.[36] Indeed, in 1977, shortly before Congress enacted the 1978 Bankruptcy Code, Congress created the Federal Energy Regulatory Commission as an independent regulatory commission within the Department of Energy with broadened powers in the implementation of that dual-regulatory

their federally delegated authority. In the fact of what thus appeared to be a delegation of federal power to a local cartel, rather like the delegation to raisin growers the Court had unanimously upheld in 1943, a majority of the Supreme Court could not conclude—despite the lawfulness of the delegation according to current constitutional doctrine—that California's law interfered with any truly *national* program of federal regulation."

**34.** See discussion, supra, pp. 871–81.

**35.** The defendants' sole reference to "legislative history" in their favor is the reference to the floor statement quoted above at page 23 of this opinion. That statement does indicate the speaker's comment that any action proposed in the plan may be taken notwithstanding any oth-

erwise applicable non-bankruptcy law "in accordance with section 1142(a) of title 11." Aside from the fact that federal courts properly give little weight to such floor statements, as discussed above, this reference clearly does not indicate any context or intent on the part of the speaker to consider and ignore the effect of § 1129 of the Code in that regard.

**36.** 16 U.S.C. §§ 791a *et seq.* It is true that the decision in *Arkansas Electric*, 461 U.S. at 384, 103 S.Ct. at 1912 refers to a "dual regulatory scheme" but states as well that utility regulation is one of the traditional powers normally reserved to the states. However, again, such general presumptions against pre-emption fall when Congress acts in an explicit manner, as I believe it did with the enactment of § 1123(a)(5) of the Bankruptcy Code.

system. 42 U.S.C. § 7171 *et seq.*, enacted August 4, 1977. As indicated earlier, under the broadened FERC legislation the federal laws dealing with public utilities have been held to preempt state regulatory authority in a number of instances.[37] Finally, the preemption here involved concerns only a possible transfer of *economic* regulatory jurisdiction as contrasted with the more acute situation where a transfer of state regulatory authority over *health* or *safety* matters is argued to be the effect of federal preemption. Cf. *Midlantic National Bank v. NJ Department*, 474 U.S. 494, 507, 106 S.Ct. 755, 762, 88 L.Ed.2d 859 (1986).

It must be admitted that from the defendants' perspective a ruling that the corporate "restructuring" of PSNH may be accomplished in a reorganization proceeding under chapter 11 of the Bankruptcy Code has very widespread ramifications for a debtor in reorganization that happens to be a regulated monopoly utility otherwise subject to NHPUC control. The question presented for decision is a tough decision in that sense—in that it clearly does involve sensitive and unprecedented issues between the state and federal authorities with regard to an appropriate balance between those authorities. The answer to that concern however is that Congress in my judgment has specifically drawn a line by its enactment of the Bankruptcy Code provisions here in question which requires that the federal interest prevail. Moreover, I believe Congress drew that line because it perceived the stalemate that

would result if it tried to give full effect to *both* the federal interest and the state interest in the context of a regulated utility debtor forced to come into a federal bankruptcy court.[38]

Corporate reorganization cannot work without substantial restructuring of the corporate entity that is relatively prompt and free from litigation costs and delays in fragmented proceedings in numerous other forums apart from the reorganization court. Section 1123(a)(5) is a very powerful and necessary restructuring tool in this regard and is essential to the corporate reorganization process. The "disruption" of state *economic* regulatory power by Congress is not really surprising in this context—in terms of a reorganization process involving a balancing of *all* economic interests in a failed enterprise. That is the quintessence of chapter 11 of the federal Bankruptcy Code.

The very fact of the PSNH chapter 11 filing demonstrates beyond dispute that in this instance the state regulatory system failed to effectively balance all economic interests. In such a situation, Congress could have reasonably concluded that preemption was necessary and appropriate—with the required restructuring of the enterprise to be accomplished in the federal forum free from the time delay and other restraints of otherwise applicable non-bankruptcy law. The failure of the PSNH enterprise and the state regulatory process to assure financial capability to meet current obligations created not only a constituency

---

**37.** See, e.g., *Mississippi Power & Light v. State of Mississippi*, 108 S.Ct. 2428; *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986); *Northwest Central Pipeline Corp. v. State Corporation Commission*, —— U.S. ——, ——, 109 S.Ct. 1262, 1276, 103 L.Ed.2d 509 (1989) (Congress' decision to create "a dual regulatory scheme" should inform consideration of preemption question). The question of federal preemption in the utility regulatory world was of course not unknown before 1978. See, *PUC of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943). See also, *Vince & Moot*, "Federal Pre-emption versus State Utility Regulation in a Post–Mississippi Era", 10 Energy Law Journal 1–79 (1989).

See discussion and other commentary cited, supra, at pp. 871–72.

**38.** It was to avoid the potential stalemate in reorganization proceeding that the district court issued an injunction in *In re MCorp*, 101 B.R. 483 (S.D.Tex.1989) to prohibit the Federal Reserve Board from interfering with the restructuring of a holding company in reorganization. Although not a preemption case, it is essentially giving the same message: regulatory agencies may not be able to block the necessary restructuring of an enterprise in reorganization that is essential to restoring the enterprise to financial health so it *can* then comply with ongoing regulatory requirements. Agency imperatives may not present a impermissible obstacle to restructuring essential to a chapter 11 reorganization.

of *ratepayers* vitally interested in the outcome of reorganization but also a constituency of *other* economic interests (creditors and shareholders) just as much impacted by the failure of the regulatory system and just as vitally interested. The financial interest of ratepayers, one of these constituencies, while important, does not supersede the financial interests of all other economic interests necessary to an appropriate balancing of competing interests in a successful reorganization.

Accordingly, I conclude that Congress did intend to remove state regulatory agencies from the "restructuring" transactions necessary in any complex reorganization, to avoid the time delays, confusion, and interference with prompt and orderly processes necessary to an effective reorganization "before the patient dies." Any experienced professional involved in corporate reorganization proceedings will recognize that reasonable "promptness" in resolving a corporate reorganization under chapter 11 is important—not only due to the enormous cost of reorganization proceedings in complex cases—but also to avoid the "suspended disasters" that can come loose in any reorganization case if the parties do not see a resolution coming forward within a reasonable timeframe.

The wisdom of Congress' intent to largely remove regulatory agencies from the "restructuring" necessary in a complex reorganization case is also particularly evident in the case of a regulated utility debtor, in which there are enormous political pressures to use every regulatory device and statutory requirement to impede such restructuring unless the parties-in-interest in the reorganization proceeding accede to regulatory demands for the lowest possible rates.[39]

In my opinion, the reorganization process of chapter 11 cannot work—in the way

Congress envisioned under the drastic overhaul of the reorganization chapters in the 1978 Act—if one party in interest has an effective veto over the necessary restructuring to implement a plan *and* the reorganization court no longer has an early and direct role in plan formulation and approval. The present chapter 11 is aimed at fostering negotiations between all parties-in-interest on a level playing field leading a consensual plan if at all possible. That underlying rationale explains I believe the Congressional action in 1978 in removing the previous powers of regulatory agencies to block a plan. It is hard to negotiate when one of the parties trundles a cannon up to the negotiating field "just in case."

The Court accordingly will answer the question presented in this adversary proceeding in favor of the plaintiff's request for declaratory relief. A separate judgment will be entered as indicated in the form of judgment annexed to this opinion. It should be noted that the judgment is drafted in the narrowest possible manner to find preemptive effect of the Bankruptcy Code provisions only as to the restructuring transactions necessary to an effective and feasible reorganization. This judgment is not a *carte blanche* for the debtor to run roughshod over all types of state regulatory processes both before and after confirmation of any plan of reorganization. It is designed to avoid the "parade of horribles" set forth by the State of New Hampshire in the arguments on this matter. Once restructuring under a confirmed plan is accomplished, the reorganized entity or entities so created will remain subject to all applicable regulatory requirement in their ongoing operations save for any questioning of the restructuring itself.

Finally, it needs to be emphasized that the question presented in this adversary

---

**39.** The new Governor of New Hampshire in his January 1989 inauguration address, referring to the PSNH reorganization proceeding, stated: "We will not as a people, as a state, be held hostage to the avarice of stock speculators and big time bondholders. We shall receive a fair settlement on our electricity rates or we shall fight." *Union Leader,* Manchester, New Hampshire, January 9, 1989. The State has vigorously acted on that basis in these proceedings. It would be surprising if political leaders would act on any other basis, particularly when a loss of some portion of their regulatory authority might occur. But the history of this case, and the constant media attention it has received, amply demonstrates the resulting political pressures for achieving the lowest possible rates.

proceeding is *not* whether the particular restructuring plan filed by the debtor is the wisest course of action for the debtor or any other parties in this case to pursue, in terms of reaching an effective and feasible reorganization at the earliest practical date. I need not and do not express any opinion on that. If the issue is presented in the confirmation process on one or more plans of reorganization in this case, the Court will react to that as it may develop. This opinion deals only with the legal question as to the permissible scope of restructuring in a plan of reorganization under the pertinent provisions of chapter 11 of the federal Bankruptcy Code.

## APPENDIX

### DECLARATORY JUDGMENT

This case was heard before the court on the Complaint for Declaratory Judgment brought by the Plaintiff chapter 11 debtor in reorganization seeking a declaration as to "the rights and obligations of Public Service and the Defendants regarding the regulatory approvals of the NHPUC, if any, required for confirmation under section 1129 of the Bankruptcy Code and implementation of the Plan or of any other plan to be filed in this chapter 11 case" dealing with certain aspects of its plan of reorganization included pursuant to the provisions of § 1123(a)(5) of the Bankruptcy Code requiring that "a plan shall.... provide adequate means for the plan's implementation" listing various enumerated provisions regarding retention, transfer, sale, and lien modification regarding its property; merger or consolidation of the debtor with other entities; cancellation or modification of indentures; amendment of the debtor's charter; and issuance of securities of the debtor in conjunction with the plan. Section 1123 provides for inclusion of such provisions in a plan of reorganization "notwithstanding any otherwise applicable nonbankruptcy law." This court by its separate Memorandum Opinion this date has set forth its findings and conclusions with regard to the request for declaratory judgment relief, which findings and conclu-

sions are incorporated herein by reference. Accordingly, it is

ORDERED, ADJUDGED and DECREED as follows:

1. Those aspects of the debtor's plan of reorganization filed December 27, 1988, or any amended plan containing similar provisions filed by the debtor or any other party in interest, that are necessary and required to effectuate the "restructuring" of the debtor into a reorganized entity or entities capable of achieving a feasible reorganization, subject to the confirmation requirements of § 1129 of the Bankruptcy Code, and are actions specifically covered by § 1123(a)(5) of the Bankruptcy Code, may be approved as part of confirmation of a plan of reorganization under the provisions of chapter 11 of the Bankruptcy Code notwithstanding any otherwise applicable law which would require approval of such actions by the New Hampshire Public Utilities Commission.

2. The approval of any rate changes included in a plan of reorganization pursuant to § 1129(a)(6) of the Bankruptcy Code remain subject to the approval authority of the New Hampshire Public Utilities Commission ("NHPUC") and any other regulatory commission having jurisdiction, after confirmation of the plan, over the rates to be charged by the reorganized entity or entities.

3. Whether such restructuring is necessary and required for a feasible reorganization will be a § 1129 issue under the Bankruptcy Code as to which the State of New Hampshire and the NHPUC and any other party in interest can be heard as part of the confirmation hearings.

4. Since consideration by the NHPUC of the public interest impact of such restructuring actions is displaced by the preemptive effect of § 1123 and § 1129 of the Bankruptcy Code, as so construed, the effect on the public interest of such a plan arguably will be one of the factors to be considered at confirmation, as to which the State of New Hampshire and the NHPUC, as full parties in interest by the court's prior orders in this proceeding, may be heard. It is unnecessary and unwise to

address that question except in the concrete context of a specific plan presented for confirmation.

5. Nothing in § 1123 or § 1129 of the Bankruptcy Code has the effect of exempting the reorganized entity or entities under a confirmed plan of reorganization from any ongoing applicable regulatory requirements by NHPUC as to the future operations of said entity or entities (save for any questioning of the restructuring itself) once the restructuring necessary and required for a feasible reorganization has been effectuated as part of a confirmed plan of reorganization.

6. Judgment accordingly is entered in favor of the plaintiff to the extent indicated. Each party shall bear their own fees and costs.

DONE and ORDERED.